

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-28-1997

# Southwestern PA v. E.Pa

Precedential or Non-Precedential:

Docket 96-3364

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Southwestern PA v. E.Pa" (1997). *1997 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 28, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3364

SOUTHWESTERN PENNSYLVANIA GROWTH ALLIANCE,
Petitioner

v.

CAROL BROWNER, Administrator of the U.S.
Environmental Protection Agency, and THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY,
Respondents

ADVANCED MANUFACTURING NETWORK,
Intervenor in support of petitioner

ON PETITION FOR REVIEW OF A FINAL ORDER
OF THE ENVIRONMENTAL PROTECTION AGENCY
(Dated May 1, 1996)

Argued: March 11, 1997

Before: BECKER, SCIRICA, and ALITO, <u>Circuit Judges</u>.

(Opinion Filed: July 28, 1997)

Barry M. Hartman, Esq. (argued)
Kenneth S. Komoroski, Esq.
John P. Englert, Esq.
William J. Labovitz, Esq.
KIRKPATRICK & LOCKHART LLP
1500 Oliver Building
Pittsburgh, PA 15222

<u>Attorneys for Petitioner</u>

Lois J. Schiffer, Esq.
Assistant Attorney General
Environment and Natural
 Resources Division

Greer S. Goldman, Esq. (argued)
Trial Attorney
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

Attorneys for Respondents

Blair S. McMillin, Esq.
Harley N. Trice II, Esq. (argued)
Paul S. Kline, Esq.
REED SMITH SHAW & MCCLAY
435 Sixth Avenue
Pittsburgh, PA 15219

Attorneys for Intervenor

John R. Serpa, Asst. County
 Solicitor
3333 Forbes Avenue, Room 312
Pittsburgh, PA 15213-3120

Kerry A. Fraas, County Solicitor
300 Ft. Pitt Commons Bldg.
445 Ft. Pitt Blvd.
Pittsburgh, PA 15219

Attorneys for Amicus Curiae County
of Allegheny, Pennsylvania

Nick Francalancia, Esq.
1040 Third Street
Beaver, PA 15009

Attorney for Amicus Curiae
Beaver County Corporation for
Economic Development

Paul J. Elias
Assistant County Solicitor
Westmoreland County
103 Courthouse Square
Greensburg, PA 15601

Attorney for Amicus Curiae
Westmoreland County, Pennsylvania

Glenn R. Toothmann III, Esq.
TOOTHMAN & TOOTHMAN
61 North Richhill Street
Waynesburg, PA 15370

Attorney for Amicus Curiae
Greene County, Pennsylvania

Paul S. Kline, Esq.
435 Sixth Avenue
Pittsburgh, PA 15219

Attorney for Amici Curiae
Armstrong County, Pennsylvania,
Lawrence County, Pennsylvania and
Butler County, Pennsylvania

McCUNE & VREELAND, Solicitor
119 South College Street
Washington, PA 15301

Jill A. Devine
Assistant Solicitor
702 Courthouse Square
100 W. Beau Street
Washington, PA 15301

Attorney for Amicus Curiae
Washington County, Pennsylvania

Clifford B. Levine
THORP, REED & ARMSTRONG
One Riverfront Center
Pittsburgh, PA 15222

Attorney for Amicus Curiae
Port of Pittsburgh Commission

Howard I. Fox
Sierra Club Legal Defense Fund
1625 Mass. Ave., N.W., Suite 702
Washington, DC 20036

Joseph Ortis Minott
Delaware Valley Citizens'
 Council for Clean Air
135 South 19th Street, Suite 300
Philadelphia, PA 19103

Attorney for Amicus Curiae
Delaware Valley Citizens' Council for
Clean Air

**OPINION OF THE COURT**

ALITO, Circuit Judge:

The Southwestern Pennsylvania Growth Alliance ("SWPGA") has petitioned for review of a final rule of the Environmental Protection Agency ("EPA"), 61 Fed. Reg. 19,193 (May 1, 1996). In this rule, the EPA denied the Commonwealth of Pennsylvania's request that the EPA redesignate the Pittsburgh–Beaver Valley nonattainment area (the "Area") to attainment status for ozone, pursuant to the Clean Air Act, 42 U.S.C. §7407(d)(3). An intervenor, Advanced Manufacturing Network, contends that the EPA's final rule is invalid because the EPA did not comply with the Regulatory Flexibility Act, 5 U.S.C. §§ 601–12. Although we are sympathetic to the view expressed by many within the Area that this rule threatens serious economic harm, we recognize that our role as a reviewing court is strictly limited. We conclude that under the applicable legal

standards, we are constrained to deny the petition for review.

I.

A. Congress enacted the Clean Air Act to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. §7401(b)(1). To achieve this purpose, the Act authorizes the EPA to identify air pollutants that are sufficiently dangerous to warrant federal regulation. See 42 U.S.C. §7408(a). For each pollutant that the EPA identifies, the Act authorizes the EPA to promulgate a national ambient air quality standard (NAAQS), which is the maximum allowable concentration of the pollutant in the ambient air. See 42 U.S.C. §7409(a).

One pollutant for which the EPA has promulgated a NAAQS is ozone, whose chemical precursors are emitted by industrial and transportation sources. See 40 C.F.R. §50.9(a) (1996). The EPA measures ozone levels at monitoring sites located throughout the country. When a monitoring site measures that a given day's "maximum hourly average ozone concentration" has exceeded the NAAQS, an "exceedance" has occurred. See 40 C.F.R. §50, App. H (1996). If a monitoring site registers more than an average of one exceedance per year, over a three-year period, that site is in noncompliance with the NAAQS. Id.

The Clean Air Act's 1990 amendments provide that the EPA designate areas of the country as either "attainment" areas, "nonattainment" areas, or "unclassifiable" areas for particular pollutants, depending on whether an area has complied with the NAAQS for that pollutant. See 42 U.S.C. 7407(d). If one monitoring site within an area is in noncompliance with a NAAQS, then the entire area is designated a nonattainment area for that pollutant. See 40 C.F.R. Pt. 50.9(a); 40 C.F.R. Pt. 50, App. H (1996). Nonattainment areas are further classified as "marginal," "moderate," "serious," "severe," or "extreme" nonattainment areas, according to the extent to which the area's monitor readings exceed the NAAQS. See 42 U.S.C.§7511a.

5

The Clean Air Act assigns to the states the responsibility for assuring air quality within each state. See 42 U.S.C. §7407(a). The Act provides that within three years of the EPA's promulgation of a NAAQS for a pollutant, each state must submit to the EPA a state implementation plan ("SIP") specifying measures that will attain, maintain, and enforce the NAAQS. See 42 U.S.C. §7410(a). All SIPs must meet the substantive requirements enumerated at 42 U.S.C. §7410(a)(2). Once the EPA finds that a SIP complies with the Act, the EPA will approve the SIP. See 42 U.S.C. §7410(k). When the EPA has designated an area within a state as a nonattainment area for a particular pollutant, that state must modify its SIP to include increasingly strict pollution controls delineated in the Act, depending on the area's nonattainment classification. See 42 U.S.C. §7511a.

The Act specifies the procedures through which the EPA may redesignate an area from nonattainment to attainment. The process begins when the governor of a state submits a request for redesignation. See 42 U.S.C. §7407(d)(3)(D). Then, "[w]ithin 18 months of receipt of a complete State redesignation submittal, the [EPA] Administrator shall approve or deny such redesignation." Id. Under 42 U.S.C. § 7407(d)(3)(E), the EPA Administrator "may not promulgate a redesignation of a nonattainment area . . . to attainment unless" the following five criteria are met:

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of this subchapter.

Id. Thus, in order for the EPA to redesignate an area from nonattainment to attainment, the EPA must find that all five of these criteria have been satisfied.

B. In 1990, the EPA classified the Pittsburgh-Beaver Valley Area (the "Area") as a moderate nonattainment area for ozone.1 See 56 Fed. Reg. 56,694, 56,820 (Nov. 6, 1991). The EPA based this designation on ozone exceedances during the three-year period from 1987 to 1989. See id. In November 1993, the Pennsylvania Department of Environmental Resources submitted to the EPA a request to redesignate the Area to attainment status for ozone. The redesignation request pointed out that the Area had attained the NAAQS for ozone during the three-year period from 1991-1993, with only two exceedances in 1991, zero exceedances in 1992, and one exceedance in 1993. See 61 Fed. Reg. 19,193, 19,195 (May 1, 1996). Pennsylvania's request acknowledged that its SIP had not yet been fully approved by the EPA, but stated that the state expected to receive full EPA approval shortly. The request also included a maintenance plan, under which Pennsylvania demonstrated how it planned to maintain the NAAQS in the area until the year 2004.2

In July 1995, the EPA published a final notice of determination that the Area was in attainment of the

───────────────────────────────────────────────

1. The Pittsburgh-Beaver Valley Area comprises Allegheny County, Armstrong County, Beaver County, Butler County, Fayette County, Washington County and Westmoreland County.

2. Pennsylvania's Department of Environmental Resources subsequently submitted two revisions to this maintenance plan. First, in January 1995, the Department submitted a revision acknowledging that the original submission was incomplete, because it relied upon measures that had not been fully adopted. The Department submitted the second revision in May 1995. This revision acknowledged that the original submission had relied upon an automobile inspection and maintenance program that Pennsylvania had suspended, as well as a contingency measure for the use of reformulated gasoline, which Pennsylvania had also suspended.

7

NAAQS for ozone. See 60 Fed. Reg. 37,015 (July 19, 1995). Later in the summer of 1995, however, ozone monitors in the Area recorded 16 exceedances over a seven-day period. Two of these monitors recorded more than three exceedances each. After confirming these data, the EPA revoked its earlier determination that the Area had attained the NAAQS for ozone. See 61 Fed. Reg. 28,061 (June 4, 1996).

The EPA also published a notice of proposed rulemaking stating its intention to disapprove Pennsylvania's redesignation request and maintenance plan. See 61 Fed. Reg. 4,598 (Feb. 7, 1996). The EPA expressed various reasons for proposing disapproval. One of the EPA's reasons was that the 1995 summer ozone exceedances indicated that the Area had not attained the NAAQS. The EPA also reasoned that these exceedances indicated that the underlying basis for Pennsylvania's maintenance plan was no longer valid. See id. After public comment, the EPA promulgated a final rule disapproving Pennsylvania's redesignation request and maintenance plan. See 61 Fed. Reg. 19,193 (May 1, 1996).

C. The petitioner in this case is the Southwestern Pennsylvania Growth Alliance, which is an organization of major manufacturers and local governments in the Pittsburgh-Beaver Valley Area. SWPGA contests the EPA's denial of Pennsylvania's request to redesignate the Area to attainment status. As previously explained, 42 U.S.C. §7407(d)(3)(E) lists five requirements that must be satisfied in order for the EPA to redesignate a nonattainment area to attainment status. Since the EPA's final rule stated that none of these five criteria had been satisfied, the petitioner, if it is to prevail, must demonstrate that the EPA erred in its determinations as to all five of §7407(d)(3)(E)'s criteria.

The petitioner thus faces an exacting burden. Under the Administrative Procedure Act, 5 U.S.C. §706(2)(A), this court must uphold the EPA's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In applying this standard, our "only task is to determine whether [the EPA] considered the relevant factors and articulated a rational connection between the facts found and the choice made." Baltimore

Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105 (1983). The EPA's disapproval of Pennsylvania's redesignation request "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider". Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

II.

SWPGA first argues that the EPA erred when it determined that the Area did not attain the NAAQS for ozone. In so arguing, SWPGA contends that the EPA had no basis for concluding that the first of 42 U.S.C. §7407(d)(3)(E)'s five requirements was not satisfied. We hold, however, that it was proper for the EPA to determine that the Area did not attain the NAAQS for ozone.

A. The petitioner contends that the EPA acted contrary to the language of the Clean Air Act when it took into consideration the ozone exceedances that were recorded in the summer of 1995. The petitioner points to language in the Act stating that "[w]ithin 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation." 42 U.S.C. §7407(d)(3)(D) (emphasis added). The petitioner argues that the use of the word "shall" in this provision imposes upon the EPA a mandatory duty to act on a state's redesignation request within 18 months of submission. According to the petitioner, the EPA violated this mandatory duty when it took into consideration the 1995 ozone exceedance data, because these data did not exist during the 18-month period. The petitioner concludes that without these improperly considered data, there was no valid reason for the EPA to deny redesignation.

We agree with the EPA that the petitioner may not raise this argument on appeal because this argument was not raised during the rulemaking process. "Generally, federal appellate courts do not consider issues that have not been passed on by the agency . . . whose action is being reviewed." New Jersey v. Hufstedler, 724 F.2d 34, 36 n.1 (3d Cir. 1983), rev'd on other grounds, 470 U.S. 632 (1985).

9

The petitioner points to the following passage from the record as evidence that Pennsylvania raised this argument in its comments to the EPA's proposed rule disapproving redesignation:

Pennsylvania believes that the Pittsburgh ozone nonattainment area should have been redesignated by EPA to attainment. The Commonwealth submitted the request in 1993, and EPA had ample opportunity and justification.

For the six year period from 1989 through 1994 the national ambient air quality standard for ozone was achieved. During this time eight ozone monitors operated for the full six years and one additional monitor operated two years at one site and the four subsequent years at a nearby site. Six of these monitors had no exceedances during this period and the remaining monitors stayed under the standard. Thus for the four consecutive three–year periods from 1989 through 1994, the Pittsburgh area attained and maintained the ambient standard.

Comments on Proposed Disapproval of Request to Redesignate Pittsburgh Ozone Nonattainment Area, J.A. at 550. Pennsylvania further commented that "the Pittsburgh area [had not] been redesignated in a timely manner." Id. at 551.

We hold that these comments are insufficient to preserve petitioner's intricate statutory interpretation argument. These comments admittedly demonstrate that Pennsylvania, during the rulemaking process, broached the question whether the EPA had acted in a timely manner. Yet the comments include neither a reference to a statutory provision imposing a specific time limit, nor an explicit argument that the existence of such a time limit precluded the EPA from considering the 1995 exceedances. The petitioner thus raises its statutory interpretation argument for the first time on appeal.

We recognize that ("our practice has been to hear issues not raised in earlier proceedings when special circumstances warrant an exception to the general rule.)" Hufstedler, 724 F.2d at 36 n.1 (considering the retroactivity

10

of amendments to a federal education act, even though the retroactivity argument was not raised in the lower court, because it was "an issue of national importance" that was "singularly within the competence of appellate courts" and "not predicated on complex factual determinations"); see also Selected Risks Ins. Co. v. Bruno, 718 F.2d 67, 69 (3d Cir. 1983). Although a variety of circumstances have prompted appellate courts to apply this exception,"[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976). In this case, we find it inappropriate to consider this new issue. Although appellate courts are certainly capable of addressing questions of statutory interpretation that were not raised during an agency's rulemaking process, it is far more efficient for courts to face such questions only after they have been considered by the agency that Congress has charged with the primary responsibility for enforcing the complex statute in question.

In the instant case, both the EPA and Pennsylvania's Department of Environmental Resources possess special expertise regarding the workings of the Clean Air Act. Pennsylvania was thus fully capable of explicitly raising the argument that 142 U.S.C. §7407(d)(3)(D) requires the EPA to act on a redesignation request within 18 months. Had Pennsylvania made such an explicit argument, the EPA would have then applied its singular expertise on the Act's mechanics and made a ruling that would inform the deliberations of this court on appeal. If this court were to consider the petitioner's argument without the benefit of the EPA's expert input, we would undermine a fundamental principle of our system of judicial review of administrative decisions.

The harm that would come to the petitioner as a result of this outcome is not so great as to warrant disregarding these concerns. See, e.g., North Alamo Water Supply Corp. v. City of San Juan, 90 F.3d 910, 916 (5th Cir.), cert. denied, 117 S.Ct. 586 (1996) (an appellate court should invoke its discretion to review a purely legal issue not raised below when "a miscarriage of justice would result

11

from [the court's] failure to consider it)." For these reasons, we hold that the petitioner may not raise for the first time in this proceeding its argument that 42 U.S.C. §7407(d)(3)(D) required the EPA to act on Pennsylvania's redesignation request within 18 months.

Moreover, even if we were to reach the merits of the petitioner's argument, we would hold that 42 U.S.C. §7407(d)(3)(D) did not preclude the EPA from considering the summer 1995 exceedance data. The language of the provision that enumerates the redesignation criteria tends to support this result. Under 42 U.S.C. §7407(d)(3)(E)(i), the EPA Administrator "may not" promulgate a redesignation of a nonattainment area unless, among other things, "the Administrator determines that the area has attained the national ambient air quality standard." The use of the term "has attained" instead of "attained" may be interpreted as suggesting that the attainment must continue until the date of the redesignation.

In any event, even if we assume for present purposes that the language of 42 U.S.C. §7407(d)(3)(E) is ambiguous as to whether the EPA may disregard data arising after the expiration of the 18-month period, we must defer to the EPA's interpretation of this provision under the rule of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Chevron instructs reviewing courts that if Congress has not "directly spoken to the precise question at issue . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 842-43. The EPA has published numerous legislative rules that have interpreted 42 U.S.C. §7407(d)(3)(E) as obliging the EPA to deny a redesignation request if the EPA knows that the area is not in present attainment of the NAAQS,3 because the EPA's

_____

3. See, e.g., 61 Fed. Reg. 19,193, 19,197 (1996) (the final rule denying Pennsylvania's request to redesignate the Area, in which the EPA "note[d] that it has not and may not (in light of section 107(d)(1)(A)(i) and 107(d)(3)(E)) approve a redesignation request for an area that is violating the ozone standard"); 61 Fed. Reg. 4,958, 4,599 (1996) (the proposed rule denying Pennsylvania's request to redesignate the Area, in which the EPA concluded that "the Pittsburgh area no longer meets

12

interpretation is a reasonable construction of the statute. See Chevron, 467 U.S. at 844 (when Congress has implicitly delegated to an agency the authority to "elucidate a specific provision of the statute by regulation," a reviewing court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").

The petitioners contend that §7407(d)(3)(D) prohibits the EPA from considering any data acquired more than 18 months after the submission of Pennsylvania's redesignation request. They assert -- correctly, in our view -- that the use of the word "shall" in §7407(d)(3)(D) imposes upon the EPA a mandatory duty to act on a state's redesignation request within 18 months. The petitioner's argument fails, however, because §7407(d)(3)(D)'s use of the word "shall" does not conclusively indicate that Congress intended to prohibit the EPA from taking action after the expiration of the statutorily specified time period.

The Supreme Court faced a similar question of statutory interpretation in Brock v. Pierce County, 476 U.S. 253 (1986). At issue in Brock was a provision of the Comprehensive Employment and Training Act ("CETA") stating that the Secretary of Labor "shall" issue a final determination as to the misuse of CETA funds by a grant recipient within 120 days after receiving a complaint alleging such misuse. See id. at 254-55. The Department of Labor disallowed almost $500,000 of CETA expenditures by a county, after an investigation revealed that those funds had not been used in accordance with the CETA program.

_____

[§7407(d)(3)(E)'s] first criteria for redesignation" in light of the summer 1995 exceedances); 59 Fed. Reg. 37,190, 37,195 (1994) (a proposed rule redesignating the Detroit-Ann Arbor area to attainment status, in which the EPA warns that if "data shows violations of the ozone NAAQS before the final USEPA action on this redesignation, the USEPA proposes that it disapprove the redesignation request"); 59 Fed. Reg. 22,757 (1994) (a final rule in which the EPA denied redesignation of the Richmond, Virginia area because that area did "not meet the statutory criteria for redesignation to attainment found in section 107(d)(3)(E) of the CAA," even though the area's only ozone exceedance was registered after the EPA published a rule proposing approval of the redesignation request).

13

The county argued that the Secretary of Labor could not recover the misused funds because the Secretary did not issue his final determination of misuse until more than 120 days after the Department received the initial complaint.

The Supreme Court thus faced the question whether the use of the word "shall" in the CETA statute prohibited the Secretary from recovering misused funds after the

expiration of the 120-day period. A unanimous Court concluded that "the mere use of the word `shall' " was not enough to demonstrate that Congress intended to prohibit the Secretary from acting after 120 days. Id. at 262. In so deciding, the Court stated that it "would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action." Id. at 260. The Court instead concluded that "the normal indicia of congressional intent" should determine whether an agency may act after the expiration of a statutory deadline. See id. at 262 n.9.

Here, the petitioner has not brought to our attention anything in the Clean Air Act itself (other than the use of the word "shall" in 42 U.S.C. §7407(d)(3)(D)), or anything in the Act's legislative history that shows that Congress intended for the EPA to lose its power to consider data brought to its attention after the expiration of the 18-month deadline. To the contrary, two important aspects of the Clean Air Act strongly suggest that Congress did not intend for the EPA to lose its power to act after 18 months. The first is the Act's failure to specify a consequence for noncompliance with the 18-month deadline. As the Supreme Court has observed, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." United States v. James Daniel Good Real Property, 510 U.S. 43, 63 (1983).

Second, the Clean Air Act affords a less drastic remedy than that urged by the petitioner. In Brock, the Supreme Court stated that when "there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." Brock, 476 U.S. at 260. The Brock court's conclusion that there existed a less drastic remedy

14

in that case provides guidance for our present inquiry. Noting that "nothing in CETA appears to bar an action to enforce the 120-day deadline," the Brock court concluded that anyone within the statute's zone of interests could have brought an action to force the Secretary of Labor to act within the statutory deadline. Id. at 260 n.7. Thus, 120 days after the original complaint, the defendant in Brock could have brought an action to force the Department of Labor to drop its investigation, provided that the defendant could achieve standing by successfully arguing that Congress enacted the 120-day limit in order "to protect grant recipients from lengthy delays in audits." Id.

Similarly, in the present case, either the petitioner or the Commonwealth of Pennsylvania could have brought an action to enforce the 18-month deadline in 42 U.S.C. §7407(d)(3)(D).4 The petitioner has not called to our attention any provision of the Clean Air Act that would have precluded such an action. Had the petitioner brought such an action, the result would have been far less drastic than that which the petitioner now urges, which is the redesignation of an area that is not in attainment of the NAAQS.

After oral argument, the parties have called to our attention certain new facts that must be considered. First, in 1995 the EPA issued a direct final notice redesignating LaFourche Parish, Louisiana, as an attainment area. After the publication of this notice, but prior to its effective date, a monitor recorded a violation of the NAAQS for ozone in the LaFourche Parish area. Although the EPA was aware of this exceedance, the EPA did not withdraw the notice, and the LaFourche Parish area was redesignated as an attainment area for ozone on the notice's effective date. The petitioner argues that this redesignation demonstrates that the EPA is not precluded from redesignating an area that

_____

4. Such an enforcement action would have been available pursuant to the Administrative Procedure Act, 5 U.S.C. #8E8E # 701-706, which entitles any person "adversely affected or aggrieved by agency action" to judicial review, §702, unless the relevant statute precludes judicial review or "agency action is committed to agency discretion by law," §701(a). In such an enforcement action, a court would have authority to "compel agency action unlawfully withheld or unreasonably delayed." §706(1).

experiences an exceedance while a redesignation request is pending.

The EPA's redesignation of the LaFourche Parish area in no way undermines the analysis set forth in this opinion. As discussed above, we accept the view that the EPA may not redesignate an area if the EPA knows that the area is not meeting the NAAQS. The EPA's redesignation of the LaFourche Parish redesignation was thus not proper. However, the fact that the EPA apparently acted contrary to law in a prior case did not permit, much less require, the EPA to disregard the law in the instant case. See Kokechik Fishermen's Assoc. v. Secretary of Commerce, 839 F.2d 795, 802–03 (D.C. Cir. 1988) ("[p]ast administrative practice that is inconsistent with the purpose of an act of Congress cannot provide an exception").

The same analysis applies to the second incident that the parties have brought to our attention. In at least one case, the EPA has excluded exceedance data from its evaluation of a redesignation request because the data came from monitors that were not part of the State or Local Air Monitoring Stations network ("SLAMS") required by 40 C.F.R. §58 (1996). The petitioner contends that such incidents undermine the proposition that EPA is required to deny a redesignation request when it possesses knowledge that the NAAQS is not being attained. Assuming arguendo that the EPA's exclusion of non–SLAMS exceedance data violates the EPA's duty not to redesignate an area that fails to attain the NAAQS, the EPA's prior disregard of this duty did not relieve the EPA of its obligation to act correctly in other cases.

B. The petitioner further attacks the EPA's conclusion that the Area did not attain the NAAQS by arguing that the EPA failed to take into account data demonstrating that much of the offending ozone originated outside the Area. The petitioner contends that ozone readings from border monitors demonstrate that much of the ozone contributing to the exceedances during the summer of 1995 originated in neighboring states and was transported into the Area by wind. In its final rule denying redesignation, the EPA included the following analysis of the interstate ozone transport question:

16

Pennsylvania has made no demonstration that the ozone problem in the Pittsburgh area is caused by transport from upwind sources. An adequate technical demonstration, including emissions data and a modeling analysis, must be provided to support any claim of transport-dominated nonattainment.

 Although ozone levels recorded at monitors near the West Virginia/Ohio/Pennsylvania border seem to correlate with the levels recorded further east in the nonattainment area, this data is not sufficient to demonstrate that the Pittsburgh area's ozone problem is due to transport. During the summer of 1995, on the days when monitors in the Pittsburgh area ("downwind" monitors in Allegheny and Westmoreland Counties) recorded exceedances of the ozone standard, ozone levels at the monitors on the western border of the Pittsburgh area (the "upwind" monitors in Beaver and Washington Counties, Pennsylvania) recorded increased levels of ozone. However, these "upwind" monitors did not record any exceedances of the ozone standard. In other words, "downwind" monitors in the Pittsburgh area always recorded higher ozone levels than the monitors at the western border. This demonstrates the Pittsburgh area is causing its own exceedances by generating ozone in the area. . . .

 . . . [E]ven if the violations in Pittsburgh could be attributed to transport, EPA would not have the authority to redesignate Pittsburgh to attainment.[42 U.S.C. §7407(d)(1)(A)(ii)] defines an attainment area as an area "that meets" the national ambient air quality standard and [§7407(d)(3)(E)] prohibits EPA from redesignating an area to attainment unless EPA determines that the area is attaining the standard. As an area that is experiencing violations of the ozone standard is not attaining the standard, EPA is not authorized by the Clean Air Act to redesignate such an area to attainment.

61 Fed. Reg. 19,193, 19,194 (May 1, 1996).

The petitioner contends that the EPA "failed to adequately analyze and consider the role transported ozone

17

and ozone precursors played in the Area's 1995 exceedances." Pet'r. Br. at 28. Although the petitioner does not seem to argue that these exceedances were caused solely by transported ozone, the petitioner maintains that such ozone plainly contributed to the 1995 exceedances. See id. The petitioner states that "[t]here is nothing in the record upon which the EPA bases its assumption that exceedances are attributable solely to sources within the border when high ozone levels are being transported into the Area." Id. at 29.

In response, the EPA argues that the Clean Air Act and its implementing regulations "require that EPA determine whether or not an area has met the NAAQS and satisfied the first criterion for redesignation without regard to why the NAAQS and the criterion many not have been met." Resp't. Br. at 30. In essence, then, the EPA maintains that the origin of the ozone that caused the 1995 exceedances was legally irrelevant. See 61 Fed. Reg. at 19,193 19,194 (the EPA's final rule denying Pennsylvania's request to redesignate the Area). The EPA goes on, however, to defend its scientific analysis of the role of transported ozone in the Area.

In evaluating the EPA's interpretation of the Clean Air Act, we must apply the familiar Chevron analysis to which we previously referred. Under this analysis, if "Congress has directly spoken to the precise question at issue. . . the court . . . must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842–43. If, however, the "precise question at issue" is one about which Congress has been either "silent or ambiguous," then a reviewing court must defer to the agency's statutory interpretation if it is "based on a permissible construction of the statute" Id. at 843.

Here, the EPA contends that the Clean Air Act itself prohibited allowances for ozone transported from outside the Area. The EPA relies in part on 42 U.S.C. §7407(d)(1)(A)(ii), which provides that an attainment area is one that "meets" the NAAQS, and 42 U.S.C. §7407(d)(3)(E)(i), which prohibits the EPA from redesignating an area to attainment unless the EPA determines that the area "has attained" the NAAQS. These

18

provisions are certainly consistent with and lend some support to the EPA's interpretation.

Somewhat stronger support for the EPA's argument is furnished by other provisions of the Act. The first of these is 42 U.S.C. §7511a(h), which establishes "rural transport areas." These are areas that do not attain the NAAQS for ozone, despite not producing any significant amount of ozone themselves. Congress addressed the problem that ozone transport causes rural transport areas by exempting such areas from certain pollution control requirements, provided that the areas make certain submissions to the EPA. Although such areas can enjoy relaxed control requirements, they must remain in nonattainment status, because they have not attained the NAAQS for ozone.

Congress also addressed the problem of ozone transport in 42 U.S.C. §7511(a)(4), which describes certain circumstances under which the EPA may adjust a nonattainment area's classification (e.g., from "severe" to "serious"). Under this provision, if a nonattainment area meets criteria making it eligible for adjustment of its classification, there are several factors that the EPA may consider when making the adjustment. One of these factors is "the level of pollution transport between the area and other affected areas, including both intrastate and interstate transport." Id. Thus, under this provision, the EPA may consider pollutant transport when adjusting a nonattainment area's classification, but pollution transport does not affect the area's designation as a nonattainment area.

Although these provisions provide significant support for the EPA's interpretation, we need not, and do not, go so far as to hold that the Clean Air Act dictates that interpretation. For present purposes, it is enough to hold that even if the Act would permit a different interpretation, the EPA's interpretation is plainly a reasonable one to which, under Chevron, we must defer. Accordingly, we accept the EPA's position that the origin of the ozone that caused the exceedances at issue is legally irrelevant.

After oral argument, the EPA brought to our attention certain administrative actions that must be addressed in

19

connection with this analysis. First, the EPA pointed out that it has issued a "Guideline on the Identification and Use of Air Quality Data Affected by Exceptional Events." See Letter from Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, to the Court at 3 (May 8, 1997), referring to U.S. Environmental Protection Agency, Office of Air and Radiation, Office of Air Quality Planning and Standards, Monitoring and Data Analysis Division, Guideline on the Identification and Use of Air Quality Data Affected by Exceptional Events, EPA–450/4–86–007 (July 1986). This Guideline permits the exclusion from consideration, for various regulatory purposes, of data affected by certain exceptional events. The only exceptional event that applies to ozone data is a "stratospheric ozone intrusion." This is a phenomenon that occurs when a parcel of air from the stratosphere suddenly falls to ground level, as occasionally happens during severe thunderstorms. See id., referring to the Guideline at 4.1.2. Second, the EPA has noted that in considering certain other redesignation requests, it has excluded ozone data as having been influenced by forest fires. See id.

The petitioner contends that it is inconsistent for the EPA to exclude ozone data that is influenced by stratospheric ozone intrusions or forest fires, but not to exclude ozone data that is influenced by interstate ozone transport. This inconsistency, the petitioner contends, undermines the argument that the Clean Air Act prohibits the EPA from redesignating an area that is not in attainment, even in cases when the nonattainment is attributable to ozone that has been transported from outside the area.

The petitioner's argument, however, does not disturb our conclusion that the EPA's interpretation of the Act as precluding allowances for transported ozone, even if not statutorily compelled, is nevertheless reasonable. The EPA's view that allowances are permissible in cases of stratospheric ozone intrusions and forest fires is not at issue here, and does not prove that the EPA's position concerning transported ozone is unreasonable.

C. In light of our deference to the EPA's interpretation of the Act as precluding allowances for transported ozone, the petitioner's attack on the EPA's scientific evaluation of the

role of transported ozone is beside the point. Yet even if it were not, we would see no ground for disturbing that analysis. A reviewing court "must generally be at its most deferential" when reviewing factual determinations within an agency's area of special expertise. New York v. E.P.A., 852 F.2d 574, 580 (D.C. Cir. 1988), cert. denied, 489 U.S. 1065 (1989). It is not the role of a reviewing court to "second-guess the scientific judgments of the EPA." American Mining Congress v. E.P.A., 907 F.2d 1179, 1187 (D.C. Cir. 1990). Rather, we must "review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence, to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotations and citations omitted).

If we were to review the EPA's final rule under this standard, we would conclude that the EPA considered the relevant data and articulated a satisfactory explanation for its findings. In its response to comments concerning the interstate transport of ozone, the EPA considered the correlation between border ozone readings and the ozone levels in the Area, but concluded that the data from the border was insufficient to demonstrate that ozone transport "caused" the exceedances in the Area. See 61 Fed. Reg. at 19,194. The EPA supported its conclusion by noting that the ozone levels were higher within the Area (where the exceedances were registered) than at the border (where no exceedances were detected), demonstrating that the Area was "causing its own exceedances by generating ozone in the [A]rea." Id. Contrary to the petitioner's suggestion, we do not interpret the EPA's explanation to mean that it found that transported ozone did not contribute to the 1995 exceedances. Rather, the EPA found only that the exceedances were not "caused by" or "due to" transported ozone. 61 Fed. Reg. at 19,194. Since the EPA considered the relevant data and articulated a rational connection between these data and its conclusion, we cannot disturb the EPA's factual determinations.

D. We thus conclude that the EPA did not act arbitrarily

21

or capriciously, did not abuse its discretion, and did not act contrary to law when it determined that the Pittsburgh–Beaver Valley area was not attaining the national ambient air quality standard for ozone. Since 42 U.S.C. §7407(d)(E)(i) prohibits the EPA from redesignating an area that is not in attainment of the NAAQS, the EPA correctly denied Pennsylvania's request for redesignation. We thus do not need to consider the petitioner's arguments that the EPA erred in determining that §7407(d)(E)'s four other criteria were also not met, since §7407(d)(E) provides that nonfulfillment of any one of its five criteria will prohibit the EPA from redesignating a nonattainment area to attainment status.5

III.

We next consider the contention of the intervenor, Advanced Manufacturing Network ("AMN"), that the EPA's final rule denying Pennsylvania's redesignation request was invalid because the EPA did not comply with the Regulatory Flexibility Act, 5 U.S.C. §§ 601–12. We conclude that the intervenor may not raise its RFA argument in this proceeding because this argument was not adequately presented to the EPA during the rulemaking process. In the alternative, we hold that the intervenor's RFA argument lacks merit, because the EPA's final rule is sufficient to satisfy the requirements of the RFA.

A. The Regulatory Flexibility Act requires administrative agencies to give public consideration to the impact that a proposed regulation will have on small entities, including small businesses, small not-for-profit enterprises, and small local governments. See 5 U.S.C. §601(3)–(6). Under

---

5. We find no merit to the petitioner's contention that it was inconsistent for the EPA to create de minimis exceptions to §7407(d)(E)'s criteria in some other cases but not in the instant case. An area's failure to attain a NAAQS is the most fundamental criterion in its designation as a nonattainment area. This is demonstrated by §7407(d)(1)(A)(i), which defines a "nonattainment" area as "any area that does not meet [the NAAQS] for the pollutant". The Area's failure to meet the NAAQS for ozone is thus a far cry from the types of trivialities that warrant the creation of a de minimis exception.

22

the RFA, at two points during the rulemaking process, an agency must prepare a regulatory flexibility analysis, which is an assessment of the proposed rule's effects on small entities. First, whenever an agency is required by law to publish a proposed rule, the agency must prepare an initial regulatory flexibility analysis. See 5 U.S.C. 603(a). Second, whenever an agency promulgates a final rule after having been required to publish a proposed rule, the agency must prepare a final regulatory flexibility analysis. See 5 U.S.C. 604(a). The RFA exempts an agency from the requirement to publish the two regulatory flexibility analyses if the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. 605(b).

In its final rule disapproving Pennsylvania's request for redesignation, the EPA made the following certification statement, which summarized a similar statement in the proposed rule:

As described in the [notice of proposed rulemaking], EPA has determined that the disapproval of the redesignation request will not affect a substantial number of small entities. EPA's denial of the Commonwealth's redesignation request under [42 U.S.C. §7407(d)(3)(E)] does not affect any existing requirements applicable to small entities nor does it impose new requirements. The area retains its current designation status and will continue to be subject to the same statutory requirements. To the extent that the area must adopt regulations, based on its nonattainment status, EPA will review the effect of those actions on small entities at the time the Commonwealth submits those regulations.

61 Fed. Reg. 19,193, 19,197.

The intervenor argues that this statement is not sufficient to satisfy the requirements of the RFA. Specifically, the intervenor contends that this statement is conclusory because it mentions neither the number of small entities that the EPA believes the rule will affect, nor the number of small entities that the EPA believes to be "substantial." The intervenor argues that the EPA erred in concluding that the

23

rule would not affect a substantial number of small entities. In the intervenor's view, the rule will affect small entities because the retention of the Area's nonattainment status will soon require the EPA to reclassify the Area from moderate nonattainment status to serious nonattainment status, thereby subjecting small entities within the Area to heightened pollution control requirements.

B. We must consider whether we have jurisdiction to hear the intervenor's RFA argument. The intervenor asserts that we have jurisdiction over the RFA claim pursuant to the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), which amended the RFA to provide, inter alia, for judicial review of agency action under the RFA. See Pub. L. No. 104-121, §242, 110 Stat. 857, 865-66 (1996) (codified as amended at 5 U.S.C. §611) ("For any rule subject to this chapter, a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of [the RFA]"). The EPA retorts that the SBREFA amendments do not provide jurisdiction over the intervenor's RFA claim, because the EPA published its final rule before the effective date of the SBREFA amendments. Thus, in order to determine whether we have jurisdiction over the intervenor's RFA claim, we must determine whether the SBREFA amendment allowing judicial review of RFA claims applies to legislative rules that were promulgated before the effective date of the SBREFA amendments.

The Supreme Court analyzed the question of the temporal reach of new statutes in Landgraf v. USI Film Prods., 511 U.S. 244 (1994), and Lindh v. Murphy, No. 96-6298, 1997 WL 338568 (U.S. June 23, 1997). In Landgraf, the Court provided the following guidance to lower courts considering the temporal reach of new federal statutes:

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether

24

the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption [against retroactive applicability] teaches that it does not govern absent clear congressional intent favoring such a result.

Landgraf, 511 U.S. at 280.

In Lindh, the Supreme Court explained that this language from Landgraf does not mean that there exist only two possible means of determining questions of temporal reach, namely, an "express command" or the Landgraf default rule. See Lindh at *3-4. Instead, this language reaffirms the traditional rule that courts will not apply statutes having retroactive effect unless Congress expressly indicated that it intended for such application. This clear statement rule has no bearing on other inquiries related to questions of temporal reach, including "determining whether a statute's terms would produce a retroactive effect" and "determining a statute's temporal reach generally." Id. To such inquiries "our normal rules of construction apply." Id.

Following Landgraf and Lindh, we consider whether the SBREFA amendments indicate the temporal reach of the amendment concerning judicial review. The only portion of the SBREFA amendments that mentions applicability to past EPA action is the following:

This subtitle shall become effective on the expiration of 90 days after the date of enactment of this subtitle, except that such amendments shall not apply to interpretative rules for which a notice of proposed rulemaking was published prior to the date of enactment.

Pub. L. No. 104-121, §245, 110 Stat. 857, 868 (1996).

The intervenor argues that since this provision expressly provides that the amendments do not apply to interpretive rules that were promulgated before the effective date, the amendments must apply to legislative rules that were

25

promulgated before the effective date, such as the legislative rule denying redesignation of the Area. This negative inference, drawn from application of the statutory interpretation canon expressio unis est exclusio alterius, is very convincing. See Lindh, 1997 WL 338568 at *4-*5.

This conclusion is bolstered by the fact that the SBREFA amendment concerning judicial review does not retroactively alter substantive rights, duties or liabilities. In its discussion of retroactive applicability, Landgraf distinguishes between two categories of intervening statutes. The first category consists of statutes that "attach[ ] new legal consequences to events completed before [the statutes'] enactment." Landgraf, 511 U.S. 269-70. Such statutes "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions always completed." Id. at 280. To such statutes, the courts apply a "deeply rooted" "presumption against statutory retroactivity," because "considerations of fairness dictate that individuals should have an opportunity to know what the law is and conform their conduct accordingly." Id. at 265, 273, 265.

The second category of intervening statutes consists of statutes that "authorize[ ] or affect[ ] the propriety of prospective relief." Id. at 273. Application of such a statute to events that took place before the statute's enactment "is unquestionably proper" because no substantive rights are retroactively affected. Id. Courts have thus "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred." Id. at 274.

We hold that the amendment entitling small entities to judicial review of agency compliance with the RFA falls within Landgraf's second category. This is because the amendment does not retroactively alter any substantive rights or duties, since the SBREFA amendment allowing judicial review did not change the substantive RFA requirements that applied to the EPA's promulgation of the final rule denying redesignation. SBREFA's judicial review amendment instead prospectively changed the jurisdiction of the federal courts to allow judicial review of an agency's

26

compliance with the RFA. We must apply such a statute to a rule promulgated before the statute's enactment. As indicated above, we hold that the text of the SBREFA amendments support this conclusion.

We note that the United States District Court for the District of Maine reached the opposite conclusion in Associated Fisheries v. Daley, 954 F.Supp. 383 (D. Maine 1997). The court in that case held that the SBREFA amendment concerning judicial review did not apply to a rule promulgated before the SBREFA amendments. In so ruling, the Associated Fisheries court observed that, in addition to the provision concerning judicial review, the SBREFA amendments also contained provisions imposing new substantive requirements upon an agency that undertakes a regulatory flexibility analysis under the RFA. Since such substantive requirements cannot be applied to rules promulgated before the amendments, the court concluded that it "would be anomalous to apply the judicial review portion of the [SBREFA] amendments to past agency actions but at the same time not apply the substance of those amendments, unless Congress expressly stated that was its intent." Id. at 387.

We disagree with the Associated Fisheries court's conclusion that the SBREFA's judicial review provision and substantive provisions must be treated uniformly for purposes of applicability to past agency actions. The Supreme Court in Landgraf addressed this precise question when it held that §102 of the Civil Rights Act of 1991 should govern cases arising before its enactment, even though other provisions of that Act imposed new substantive requirements. The Landgraf Court reasoned as follows:

[T]here is no special reason to think that all the diverse provisions of the Act must be treated uniformly for [purposes of applicability to past conduct]. To the contrary, we understand [the statute's] instruction that the provisions are to "take effect upon enactment" to mean that courts should evaluate each provision of the Act in light of ordinary judicial principles concerning the application of new rules to pending cases and pre-enactment conduct.

27

Landgraf, 511 U.S. at 280.

We conclude that it is proper to apply the SBREFA's judicial review amendment to past agency action, even assuming that it would be inappropriate to apply the SBREFA's substantive amendments to past agency action. For these reasons, we conclude that we have jurisdiction over the intervenor's RFA claim, pursuant to the SBREFA's judicial review amendment.

C. EPA contends that the intervenor may not raise its RFA argument because the petitioner, SWPGA, did not raise this argument in its own brief. It is a general rule that an intervenor may argue only the issues raised by the principal parties and may not enlarge those issues. See Vinson v. Washington Gas Light Co., 321 U.S. 489, 498 (1944); Synovus Fin. Corp. v. Board of Governors, 952 F.2d 426, 433 (D.C. Cir. 1991). The intervenor contends that the petitioner sufficiently raised the RFA issue in its brief through the following incorporation by reference:

Petitioner incorporates by reference the statement of issues raised by Intervenor with regard to whether EPA erred in certifying under the Regulatory Flexibility Act that its disapproval of the Commonwealth of Pennsylvania's request for redesignation would have no effect on small entities.

Petitioner's Br. at 2 n.3.

The EPA argues that such an incorporation by reference is insufficient to satisfy the rule that a principal party must raise an issue in its brief before an intervenor may argue it. In support of this argument, the EPA points to Time Warner v. FCC, 56 F.3d 151, 202 (D.C. Cir. 1995), cert. denied, 116 S.Ct. 911 (1996). The court in Time Warner was presented with an intervenor's claim that certain FCC orders did not comply with the RFA and the Small Business Act ("SBA"). The only mention of the RFA and SBA arguments in the brief of the Time Warner petitioners was "a short two-sentence footnote." Id. This footnote "neither explain[ed] nor develop[ed] the statutory challenges, noting only that the intervenors' brief [would] discuss this issue." Id. (internal quotation omitted). The Time Warner court concluded that such a "terse reference in a complex regulatory case is

28

insufficient to raise an issue unrelated to petitioners' other challenges and not discussed elsewhere in their briefs or even mentioned in their petition for review." Id.

We agree with the EPA that under Time Warner intervenor AMN could not raise its RFA argument because petitioner SWPGA's incorporation by reference did not sufficiently broach the issue. However, we decline to follow Time Warner on this point. In its analysis of this issue, the Time Warner court relied on Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.), and Railway Labor Executives' Ass'n v. United States R.R. Retirement Board, 749 F.2d 856, 859 (D.C. Cir. 1984). See id. We believe that the Time Warner court misapplied these precedents when it concluded that an intervenor may not raise an argument that a principal party mentions only in an incorporation by reference.

The court in Carducci reviewed a federal employee's claims that he was unlawfully reassigned to a position of lower rank. In his complaint, the disgruntled employee asserted, inter alia, that his employing agency violated his Fifth Amendment right to due process when it reassigned him. The district court's opinion, which dismissed the employee's complaint, did not discuss his due process claim. In his appellate brief, the employee expressed his due process argument only through a single assertion that an official who reviewed the reassignment "rel[ied] on information not contained in the grievance file or record when he issued his final decision on the grievance." Carducci, 714 F.2d at 176.

On appeal, the District of Columbia Circuit did not address the employee's due process claims because the employee had "made no attempt to address the issue." Id. at 177. The court stated that it would not resolve the complex legal issues that the employee's claim presented "on the basis of briefing and argument by counsel which literally consisted of no more than the assertion of violation of due process rights, with no discussion of case law supporting that proposition or of the statutory text and legislative history relevant" to the legal questions involved. Id. The court so ruled because consideration of complicated legal questions without proper briefing by the parties would

29

ultimately deprive the courts of the assistance of counsel that our adversarial system assumes. Id.

We endorse the Carducci court's conclusion that appellate courts generally should not address legal issues that the parties have not developed through proper briefing. However, the situation in Carducci differs dramatically from that in both Time Warner and the instant case, in which a party has adopted by reference an argument that is thoroughly developed in an intervenor's brief. As then–Judge Scalia explained in the Court of Appeals' decision in Carducci, deciding legal issues without proper briefing can result in bad decisions. No similar danger is presented, however, when a petitioner incorporates by reference an argument that is fully developed in an intervenor's brief. We thus disagree with Time Warner on this point, and we hold that when a principal party adopts by reference an argument that an intervenor fully briefs, the intervenor may argue the question just as if the principal party had fully briefed the issue itself.

We find further support for our conclusion in the fact that this practice does not differ substantively from the practice of an appellant's (or appellee's) adopting by reference part of the brief of a coappellant (or coappellee), which is expressly permitted under Fed. R. App. P. 28(i). Applying this analysis to the instant case, we conclude that intervenor AMN is not precluded from raising its RFA argument by the fact that petitioner SWPGA adopted the intervenor's RFA argument by reference, rather than fully developing the argument in its own brief.

D. Although we have jurisdiction over the intervenor's RFA claim, and although the parties have properly briefed the question, we hold that the intervenor may not raise this issue in this proceeding because it was never presented to the EPA during the rulemaking process. "Generally, federal appellate courts do not consider issues that have not been passed on by the agency . . . whose action is being reviewed." Hufstedler, 724 F.2d at 36 n.1.

The intervenor has not identified any section of the record in which the EPA was presented with an argument that mentions the applicability of the RFA to the EPA's

30

rulemaking. The only section of the record that the intervenor has identified as relevant to its RFA argument is a discussion of the circumstances that will result in a "bump up" of an area's nonattainment classification. See Intervenor's Reply Br. at 8, citing J.A. at 298. The intervenor argues that this discussion is relevant to its argument that retention of the Area's nonattainment status will affect small entities by subjecting them to enhanced pollution control requirements when the EPA subsequently "bumps up" the Area's nonattainment classification. This argument is flawed, however, because the section of the record to which the intervenor points discusses the nonattainment classification of the Reading area, not the Pittsburgh–Beaver Valley area. See id. Since the intervenor has brought to our attention no other portion of the record relevant to its RFA argument, we conclude that the intervenor may not raise this argument before this Court because this argument was never presented to the EPA during the rulemaking process.

E. We hold in the alternative that the EPA's certification statement satisfies the requirements of the RFA. The EPA's statement complies fully with 5 U.S.C. §605(b), which sets out certain circumstances under which the requirement of a regulatory flexibility analysis does not apply. Under §605(b), an agency may avoid preparing a regulatory flexibility analysis if the agency publishes in the Federal Register a certification that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. §605(b). Along with this certification, the agency must also publish a "statement providing the factual basis for such certification." Id. The intervenor contends that the EPA violated this provision because the EPA's statement did not sufficiently explain the agency's reasons for the certification. According to the intervenor, the statement is deficient because it mentions neither the number of small entities that the EPA believes the rule will affect, nor the number of small entities that the EPA believes to be "substantial."

We hold that the EPA's statement is sufficient to satisfy the requirements of §605(b). Directly applicable to this

31

inquiry is <u>Colorado State Banking Bd. v. Resolution Trust Corp.</u>, 926 F.2d 931 (10th Cir. 1991). In that case, the Resolution Trust Corporation ("RTC") adopted a rule that would allow banks to operate acquired insolvent thrifts as bank branches, notwithstanding Colorado and New Mexico laws that prohibited such operation. These two states contended that the RTC's adoption of the rule did not satisfy the §605(b) criteria for exemption from the obligation to undertake a regulatory flexibility analysis. In promulgating the rule, the RTC published the following certification statement:

The basis for the RTC's certification is its determination that the rule will not impose compliance requirements on depository institutions of any size. It imposed no performance standards, no fees, no reporting or recordkeeping criteria, nor any other type of restriction or requirement with which depository institutions must comply. Thus, it does not have the type of economic impact addressed by the EPA.

<u>Id</u>. at 948.

The Tenth Circuit held that the RTC's brief statement "present[ed] a valid basis for certification" because it addressed the RFA's concern for "the high cost to small entities of compliance with uniform regulations." <u>Id</u>., quoting <u>Mid-Tex Elec. Coop., Inc. v. FERC</u>, 773 F.2d 327, 342 (D.C. Cir. 1985). Similarly, the EPA's statement in the instant case, which closely resembles the RTC's statement in <u>Colorado State Banking Board</u>, adequately addressed this concern by noting that the denial of redesignation "does not affect any existing requirements applicable to small entities nor does it impose new requirements." 61 Fed. Reg. 19,193, 19,197.

We also find no merit in the intervenor's contention that the EPA erred when it concluded that the final rule would not affect the requirements applicable to small entities. The intervenor argues that the EPA's disapproval of Pennsylvania's redesignation request will soon result in a "bump up" of the Area's nonattainment classification from "moderate" to "severe." This will happen, the intervenor posits, because 42 U.S.C. §7511(b)(2)(A) provides that an

32

area that fails to attain the NAAQS by the applicable attainment date "shall be reclassified by operation of law" to the next higher classification. Since reclassification to "severe" status will impose stricter pollution control requirements upon small entities in the Area, the intervenor contends that the EPA erred when it certified that the denial of redesignation would not alter the requirements applicable to small entities in the Area.

Although the intervenor accurately describes the operation of §7511(b)(2)(A), its argument isflawed because the more stringent pollution controls will result from the rulemaking process that will accompany the reclassification under §7511(b)(2)(A), not the rulemaking process through which the EPA denied the redesignation request. When the time comes for §7511(b)(2)(A) to reclassify the Area by operation of law, the EPA will provide notice and an opportunity for the public to comment, which will include the opportunity to comment on the requirements of the RFA. The EPA made this observation in its certification statement, when it said that "to the extent that the area must adopt regulations, based on its nonattainment status, EPA will review the effect of those actions on small entities at the time the Commonwealth submits those regulations." For this reason, we conclude that the EPA correctly determined that small entities would not be affected by the particular rulemaking at issue in this case, namely, the EPA's denial of Pennsylvania's request to redesignate the Area.

IV.

For the reasons discussed above, we deny the petition for review of the EPA's final rule denying Pennsylvania's request to redesignate the Pittsburgh–Beaver Valley area from nonattainment to attainment status.

33

BECKER, <u>Circuit Judge</u>, concurring.

I join in Judge Alito's fine opinion. This brief concurrence is merely to record my view that there is something amiss, or at least unfair, in the EPA's treatment of regions such as the Pittsburgh-Beaver Valley nonattainment area which, because of the geographical configuration of the jet stream, receives a constant infusion of transported ozone from highly industrialized upwind sources. Although I lack the technical expertise of the agency, my immersion in the record in this case has left the distinct and indelible impression that, while laudably attempting to fulfill its statutory mission of assuring cleaner air, the EPA has paid insufficient attention to: (1) the difficulty that downwind areas such as Southwestern Pennsylvania have in meeting the ozone NAAQS, and (2) more importantly, the imperative of infusing its regulations with equity. The economic consequences to the area as the result of continued nonattainment status are enormous, as this record demonstrates, and surely assuring equity vis-a-vis other areas of the nation is within the agency's charter. I suspect there are several avenues through which the EPA could afford relief to the Pittsburgh-Beaver Valley region and other similarly situated areas without violating its statutory mandate.

Modest escape valves already exist within the current regulatory structure. For example, an EPA guideline permits the "flagging" of data affected by certain exceptional events in carrying out various regulatory tasks. As Judge Alito explains, this guideline authorizes the EPA to disregard ozone data influenced by the phenomenon of stratospheric ozone intrusion. <u>See</u> U.S. Environmental Protection Agency, Office of Air and Radiation, Office of Air Quality Planning and Standards, Monitoring and Data Analysis Division, <u>Guideline on the Identification and Use of Air Quality Data Affected by Exceptional Events</u>, EPA-450/4-86-007 (July 1986). Additionally, the EPA has acknowledged that it has, in the past, excluded ozone data affected by forest fires in evaluating other redesignation requests.

The presence of these exceptions highlights the problem faced by communities such as the Pittsburgh-Beaver Valley

34

area, whose herculean and largely successful efforts to combat air pollution may be derailed due to circumstances (upwind ozone) beyond its control. The tremendous remedial efforts undertaken by those regions seem to have been inadequately considered when contrasted with the aforementioned regulatory mollifications.

I would urge Congress to address the burdens faced by the Pittsburgh-Beaver Valley nonattainment region and other areas in the same predicament. Congress has taken into account the problem of transported ozone in the past, excusing certain so-called "rural transport areas" from certain pollution control requirements. See 42 U.S.C. § 7511a(h). I see no reason to treat metropolitan areas differently, especially where, as here, a region has achieved such significant emissions improvements. I acknowledge the potentially ameliorative effects of the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq., but it does not directly address the problems facing Southwestern Pennsylvania.

I would also urge the EPA to address these problems in the regulatory context. If the EPA and Congress satisfactorily address the referenced issues, we may be able to avoid a succession of expensive and burdensome litigations like this one. Judge Scirica joins in this concurrence.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

35