390 F.Supp.2d 437 (2005)
AARP, et al., Plaintiffs,
v.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant.
No. 05-CV-509.
United States District Court, E.D. Pennsylvania.
September 27, 2005.
*438 *439 *440 *441 Christopher G. Mackaronis, Brickfield Burchette Ritts & Stone, P.C., Laurie A. McCann, AARP Foundation Litigation, Michael J. Schrier, Bell Boyd & Lloyd PLLC, Washington, DC, Stephen G. Console, Console Law Offices LLC, Philadelphia, PA, for Plaintiffs.
Gillian Flory, Henry A. Azar, Jr., Jacqueline Eloine Coleman, Jennifer R. Rivera, U.S. Department of Justice, Douglas L. Greenfield, Bredhoff & Kaiser PLLC, Ann Elizabeth Reesman, Daniel Yager, McGuiness Norris & Williams LLP, Washington, DC, Joan K. Garner, U.S. Attorney's Office, Daniel P. O'Meara, Montgomery McCracken Walker & Rhoads, LLP, Philadelphia, PA, for Defendants.

MEMORANDUM AND ORDER
ANITA B. BRODY, District Judge.
I. INTRODUCTION
In this suit under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (the "APA"), the AARP challenges a regulation proposed by the Equal Employment Opportunity Commission (the "EEOC"). The proposed regulation would exempt certain employer practices from the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"), as amended by the Older Workers Benefit Protection Act, Pub.L. No. 101-433 (1990) (the "OWBPA").[1] Before me is the EEOC's motion to vacate this Court's Order of March 30, 2005, granting summary judgment to plaintiffs AARP, et al. (collectively referred to as "the AARP"). AARP v. EEOC, 383 F.Supp.2d 705, 2005 WL 723991 (E.D.Pa. Mar.30, 2005) ("AARP I"). EEOC moves for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b), citing an intervening change in law as a result of the Supreme Court's recent decision in National Cable and Telecommunications Association v. Brand X Internet Services, ___ U.S. ___, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). For the reasons set forth below, I will grant Defendant's motion.
II. BACKGROUND
On March 30, 2005, I permanently enjoined the EEOC from publishing or otherwise implementing a "Proposed Rulemaking"[2] that would exempt from the prohibitions of the ADEA "the practice of altering, reducing, or eliminating employer-sponsored retiree health benefits when retirees become eligible for Medicare or a State-sponsored retiree health benefits program."[3] 68 Fed.Reg. 41542, 41542 *442 (July 14, 2003); AARP I, 2005 WL 723991, at *6. Applying the test of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I held that the challenged regulation was contrary to law and Congressional intent under the ADEA and its amendments. AARP I, 2005 WL 723991, at *6. In so holding, I expressly noted that I was bound by the Third Circuit's decision in Erie County Retirees Association v. County of Erie, 220 F.3d 193 (3d Cir.2000), and that Erie County required my conclusion that the regulation failed the first step of the Chevron test.
The EEOC filed a notice of appeal on May 31, 2005. On June 27, 2005, while the appeal was still pending, the U.S. Supreme Court decided National Cable and Telecommunications Association v. Brand X Internet Services, ___ U.S. ___, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ("Brand X"), which dramatically altered the respective roles of courts and agencies under Chevron. Brand X held that a court's interpretation of a statute only bars an agency from interpreting that statute differently from the court if the court has determined the only permissible meaning of the statute. See Brand X, 125 S.Ct. at 2701. Because the Third Circuit's Erie County decision did not determine the only permissible meaning of the relevant provisions of the ADEA, under Brand X, I am not bound by Erie County in reviewing the EEOC's regulation. Brand X also clarified the degree of deference due to agency interpretations under Chevron, and made it clear that the EEOC's exemption satisfies Chevron' s two-step test.
Because of the impact of Brand X on the continuing validity of my permanent injunction, I gave the EEOC leave to file a motion for relief from judgment pursuant to Rule 60(b). The Third Circuit stayed the appeal and remanded the case to me for consideration of this motion. (Order of 7/14/05.) Both parties submitted briefs on whether I should vacate my March 30, 2005 Order in light of Brand X, and I now vacate that Order. At this point, there are no genuine issues of material fact with respect to Count I of Plaintiffs' complaint, which alleged that the regulation was "arbitrary, capricious, and not in accordance with law." (Pls.' Compl. at 22.) Because Defendant is entitled to judgment as a matter of law, I will grant summary judgment to Defendant on Count I. Because my March 30, 2005 Order granted summary judgment for Plaintiffs on Count I, it was not necessary to reach Count II, alleging violations of the APA's notice-and-comment requirements. (Id.) Because there are no genuine issues of material fact with respect to this count, and Defendant is entitled to judgment as a matter of law, I will also grant summary judgment to Defendant on Count II.
My Order of March 30, 2005 permanently enjoined the EEOC from "publishing or otherwise implementing the regulation at issue in this case," AARP I, 2005 WL 723991, at *6, and I now dissolve that injunction. However, because the parties have already indicated their intention to appeal, I will stay the portion of this Order vacating the permanent injunction, so that the injunction will remain in effect pending appeal.
*443 III. LEGAL STANDARD
Federal Rule of Civil Procedure 60(b) provides:
On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: ... (5) ... it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.
Fed.R.Civ.P. 60(b). It is appropriate to grant a Rule 60(b)(5) motion "when the party seeking relief from an injunction or consent decree can show `a significant change either in factual conditions or in law.'" Agostini v. Felton, 521 U.S. 203, 215, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). A change in law can also qualify as one of the "other reasons" justifying relief under Rule 60(b)(6). While "[i]ntervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)," Agostini, 521 U.S. at 239, 117 S.Ct. 1997, "a supervening change in governing law that calls into question the correctness of the court's judgment may ... constitute such an extraordinary circumstance justifying the granting of a Rule 60(b) motion." United States v. Enigwe, 320 F.Supp.2d 301, 308 (E.D.Pa.2004) (internal citations omitted).[4]
Thus, I must determine whether the change in governing law occasioned by the Supreme Court'sBrand X decision has "call[ed] into question the correctness" of my earlier injunction, id., or made it "no longer equitable that the judgment should have prospective application," Fed.R.Civ.P. 60(b)(5). I will begin by summarizing my earlier opinion and the Supreme Court's decision in Brand X, and then analyze the effect of Brand X on the legal basis for my AARP I decision.
IV. DISCUSSION
A. Earlier Opinion
The AARP brought suit to enjoin the EEOC from implementing a rule that would permit employers who provide healthcare benefits to retired employees to decrease those benefits when employees become eligible for Medicare. AARP I, 2005 WL 723991, at *1. The AARP argued that the regulation violated section 4(a)(1) of the ADEA,[5] and was thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA, 5 U.S.C. § 706(2). (Pls.' Compl. at 22.) The AARP claimed that the regulation was foreclosed by the Third Circuit's interpretation of section 4(a)(1) in Erie County Retirees Association v. County of Erie, 220 F.3d 193 (3d Cir.2000). In Erie County, the Third Circuit held that the *444 ADEA's prohibitions applied to the practice of coordinating retiree healthcare benefits with Medicare eligibility, and that an employer could not reduce benefits to Medicare-eligible retirees unless it could meet the conditions of the "equal benefit or equal cost" safe harbor of the ADEA, 29 U.S.C. § 623(f)(2)(B)(i).[6] In AARP I, while not disputing the holding of Erie County,[7] the EEOC claimed that the regulation at issue fell within its authority under section 9 of the ADEA, which gives the EEOC power "to issue such rules and regulations as it may consider necessary or appropriate for carrying out this chapter" and "to establish ... reasonable exemptions to and from any or all provisions of this chapter as it may find necessary and proper in the public interest." 29 U.S.C. § 628.
Because I was asked to review an administrative agency rule for its consistency with congressional intent, I applied the familiar two-part Chevron test to the challenged regulation. See Chevron, 467 U.S. at 843, 104 S.Ct. 2778; Marincas v. Lewis, 92 F.3d 195, 200 (3d Cir.1996). The first step of the Chevron test asks "whether there is a clear and unambiguous congressional intent concerning the precise question in issue." Marincas, 92 F.3d at 200; see Chevron, 467 U.S. at 843, 104 S.Ct. 2778. In answering this question, I noted that I did not write on a clean slate, but rather was bound by the Third Circuit's decision in Erie County that the ADEA prohibited the employer practice at issue. AARP I, 2005 WL 723991, at *3.
In Erie County, the Third Circuit analyzed whether Medicare coordination of retiree health benefits constituted "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); Erie County, 220 F.3d at 208-13. The court looked first to the phrase "terms, conditions, or privileges of employment," which had been defined in the OWBPA to include "all employee benefits." 29 U.S.C. § 630(1); Erie County, 220 F.3d at 209. The court concluded that "the ordinary meaning of the term `employee benefit' should be understood to encompass health coverage and other benefits which a retired person receives from his or her former employer." Erie County, 220 F.3d at 209. Next, the court considered whether *445 Medicare eligibility was an "age-based criterion," and concluded that it was. Id. at 210-12. The court next held that the use of the term "older worker" rather than "older employee" in the language of the "equal benefit or equal cost" safe harbor, 29 U.S.C. § 623(f)(2)(B)(i), was not meant to exclude retirees. Id. at 215-16. The court thus rejected the argument that Congress had used the term "older worker" to indicate that employers could reduce retiree benefits without meeting "equal benefit or equal cost." Id. Finally, the court concluded that none of the ADEA's other safe harbors were applicable. Id. at 213-16. Thus, the Third Circuit held that unless an employer could satisfy the "equal benefit or equal cost" test, the ADEA prohibited the practice of reducing retiree health care benefits in response to Medicare eligibility.
Accordingly, when applying step one of the Chevron test to the EEOC's proposed exemption of this practice, I concluded that "the Third Circuit has already determined that Congress expressed a clear and unambiguous intent with regard to the precise question at issue." AARP I, 2005 WL 723991, at *3. I went on to reject the EEOC's argument that section 9 of the ADEA gave it the authority to promulgate the regulation notwithstanding the Third Circuit's decision that Congress intended the ADEA to prohibit the conduct in question. AARP I, 2005 WL 723991, at *5-6. Because I found that the EEOC's proposed regulation failed step one, I did not reach step two of the Chevron test  whether the regulation is "based on a permissible construction of the statute" such that it is "a reasonable policy choice for the agency to make." Chevron, 467 U.S. at 843, 845, 104 S.Ct. 2778. Because I found the regulation at issue to be contrary to law, I granted summary judgment to Plaintiffs on Count I of their complaint and did not need to reach the other count. AARP I, 2005 WL 723991, at *6.
B. The Brand X Decision
The EEOC appealed, and while the case was pending before the Third Circuit, the Supreme Court decided Brand X, which cast grave doubts upon the basis for my ruling in AARP I. Like this case, Brand X involved the question of when a court's prior interpretation of a statute forecloses a later, contrary construction by an administrative agency. The Brand X decision clarified the respective roles of courts and agencies in two key ways that altered the underpinnings of my AARP I decision. First, Brand X concluded that "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." Brand X, 125 S.Ct. at 2700 (emphasis added). Put differently, Brand X states that the only court decision that forecloses a later, contrary interpretation of a statute by an agency is a decision that determines the only permissible reading of the statute, not merely the best of several alternatives. See id. at 2701.
In addition, Brand X clarified the Chevron standard itself. In applying Chevron's first step to the regulation at issue in Brand X, the Supreme Court did not ask merely whether Congress had "spoken to the precise question at issue," Chevron, 467 U.S. at 843, 104 S.Ct. 2778, but rather "whether the statute's plain terms `directly addres[s] the precise question at issue.'" Brand X, 125 S.Ct. at 2702 (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778) (emphasis added). Thus, Brand X makes it clear that Chevron step one focuses on the plain text of the relevant statute to determine whether Congress has spoken. As discussed further below, Brand X has established *446 that the relevant inquiry at Chevron step one is the same as for determining whether a court decision will foreclose contrary agency interpretation  whether the statutory text compels only one permissible interpretation.
In Brand X, the Supreme Court considered Title II of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 151 et seq., which defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public." 47 U.S.C. § 153(46); Brand X, 125 S.Ct. at 2697. Brand X involved a Declaratory Ruling[8] by the Federal Communications Commission (the "FCC") that cable companies providing cable modem Internet service were not providing "telecommunications service," but rather "information service," and were thus exempt from certain common-carrier regulations. Id. at 2697-98. Numerous parties challenged the FCC's ruling, arguing that "telecommunications service" as used in the Communications Act includes cable modem service. Id. at 2698.
The Ninth Circuit vacated the FCC regulation insofar as it concluded that cable modem service was not telecommunications service. Brand X Internet Serv. v. FCC, 345 F.3d 1120, 1132 (9th Cir.2003) ("Brand X v. FCC"). In vacating the FCC regulation, the Ninth Circuit relied on its earlier decision in AT&T v. City of Portland, 216 F.3d 871 (2000), a case that did not involve the application of Chevron deference. See Portland, 216 F.3d at 876. In Portland, the Ninth Circuit had determined that the Communications Act included cable modem service in the definition of "telecommunications service." Id. at 878. Because the Ninth Circuit considered itself bound by stare decisis to follow Portland' s construction of the Communications Act, it did not even apply Chevron to the FCC regulation at issue in Brand X, but instead vacated it solely on the authority of Portland. See Brand X v. FCC, 345 F.3d at 1132. In so holding, the Ninth Circuit relied heavily on language from the Supreme Court's decision in Neal v. United States, 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996):
Once [a court] has determined a statute's meaning, the court must adhere to that prior ruling under the doctrine of stare decisis and assess an agency's later interpretation of the statute against that settled law.
Brand X v. FCC, 345 F.3d at 1132-33 (quoting Neal, 516 U.S. at 294, 116 S.Ct. 763).
On certiorari, the Supreme Court reversed the Ninth Circuit and upheld the challenged FCC regulation. The Court held that the Ninth Circuit had erred in following its ruling in Portland rather than affording the challenged regulation Chevron deference, because "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." Brand X, 125 S.Ct. at 2700. The Court derived this principle from Chevron itself and its underlying premise that "it is for agencies, not courts, to fill statutory gaps." Id. (citing Chevron, 843-44 and n. 11, 104 S.Ct. 2778). Turning to the Ninth Circuit's Portland decision, the Court concluded that "[n]othing in Portland held that the Communications Act unambiguously required treating cable Internet providers *447 as telecommunications carriers." Id. To the contrary, the Court concluded:
Portland held only that the best reading of [the Act] was that cable modem service was a `telecommunications service,' not that it was the only permissible reading of the statute.
Id. (emphasis in original). Because Portland did not hold that its particular interpretation of the statute was the "only permissible" construction, rather than merely "the best," the Court determined that Portland could not control the Ninth Circuit's review of the FCC regulation. Rather, the Court concluded, the Ninth Circuit should have afforded the regulation Chevron deference.[9]
Finally, the Supreme Court itself applied the Chevron test to the challenged FCC regulation. Under the first step, it considered "whether the [Communications Act's] plain terms `directly addres[s] the precise question at issue.'" Brand X, 125 S.Ct. at 2702 (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778). The Court considered the "precise question" to be "whether cable companies providing cable modem service are providing a `telecommunications service'...." Id. at 2702-03. The Court concluded that because the word "offering" as used in the Communications Act did not unambiguously dictate one particular interpretation of the statute, the FCC regulation passed Chevron' s first step. Id. at 2704. Finally, the Court found that the FCC's rule was a "reasonable policy choice for the agency to make," thus satisfying Chevron's second step. Id. at 2708 (quoting Chevron, 467 U.S. at 845, 104 S.Ct. 2778). Accordingly, the Court reversed the Ninth Circuit and upheld the challenged regulation. Id. at 2712.
C. The Effect of Brand X on my Holding in AARP I
As already stated, Brand X has cast grave doubts on the legal basis for my ruling in AARP I. The Ninth Circuit's Brand X decision, which the Supreme Court ultimately reversed, was in many ways parallel to my own decision in AARP I. Just as the Ninth Circuit relied on the stare decisis effect of Portland in striking down the regulation at issue, I relied on the precedential value of the Third Circuit's Erie County decision. Moreover, to justify my reliance on Erie County, I quoted the very same language from Neal that the Ninth Circuit cited in Brand X, see AARP I, 2005 WL 723991, at *3; Brand X v. FCC, 345 F.3d at 1132-33, and which the Supreme Court concluded the Ninth Circuit had relied on erroneously. See Brand X, 125 S.Ct. at 2701. Although, unlike the Ninth Circuit, I did apply the Chevron test to the agency regulation at issue, Brand X did not merely command the lower courts to apply Chevron rather than their own circuit's precedents. Rather, Brand X stands for the broader proposition that a prior court interpretation of a statute cannot trump a subsequent agency interpretation unless the court holds that its interpretation is the only permissible, not merely the best, construction of the statute. See Brand X, 125 S.Ct. at 2701.
*448 In AARP I, I concluded that I was bound by the Third Circuit's decision in Erie County to hold that the EEOC's proposed rule violated the ADEA:
In this case I will not reach the second step of Chevron because the Third Circuit has already determined that Congress has expressed a clear and unambiguous intent with regard to the precise question at issue. AARP I, at *3.
However, Brand X has established a considerably more stringent standard for when a construction can be said to "follo[w] from the unambiguous terms of the statute." Brand X, 125 S.Ct. at 2700. Crucially, Brand X makes it clear that where a court's holding states merely the "best" interpretation of a statute, not the "only permissible" interpretation, the court decision does not foreclose a later, differing agency interpretation. Id. at 2701. Because the Third Circuit's opinion in Erie County did not hold that it was the only permissible interpretation of the ADEA, it cannot foreclose a contrary interpretation by the EEOC.
D. The Holding of Erie County
Brand X requires a closer reading of the Erie County decision than was necessary in AARP I, and this close reading demonstrates that Erie County's interpretation of section 4(a)(1) is only the best of several alternatives; it is not the "only permissible" interpretation within the meaning of Brand X. First of all, Erie County does not explicitly state that its holding is the "only permissible reading of the statute." Indeed, in its discussion of whether defendants could satisfy the "reasonable factors other than age" safe harbor, the Erie County court seems to acknowledge that its decision is not the only possible interpretation: "While it is possible that Congress intended Medicare eligibility to be a `reasonable factor other than age,' we believe it is more likely that Congress would have drafted a specific provision addressing the issue...." Erie County, 220 F.3d at 214 (emphasis added). It is understandable that the Third Circuit would not have stated that its interpretation was the only one permitted by the statute's plain language, because prior to Brand X there was no reason to do so. However, where the court did make a plain-language determination of an issue, it stated so explicitly: "[T]he plain language of section 623(f)(2)(B)(i) [the `equal benefit or equal cost' safe harbor] ... indicates that Congress intended [it] to apply when an employer reduces health benefits based on Medicare eligibility." Id. at 215 (emphasis added). Thus, it is relevant that Erie County does not state that its ultimate conclusion is inescapably dictated by the ADEA's plain language. Because the Erie County opinion does not expressly state whether it determined the only permissible reading of the statute, rather than merely the best reading, it is appropriate to analyze the opinion's reasoning.
At the outset of its analysis, the Third Circuit states that it is "left with a rather difficult task of statutory interpretation in this case." Erie County, 220 F.3d at 208. The court's own characterization of its interpretive task as "difficult" would seem to undermine the notion that the statutory text compels a single interpretation. Moreover, the Erie County opinion points to inherent ambiguities in the statutory text. It is true that the court states at one point that "the ordinary meaning of the term `employee benefit' should be understood to encompass health coverage and other benefits which a retired person receives from his or her former employer." Id. at 209. However, in the next paragraph, the court indicates ambiguities in the word "employee." After noting that the ADEA's definition of the term "employee" is the same as that of Title VII of *449 the Civil Rights Act of 1964, the Third Circuit draws an analogy to the Supreme Court's interpretation of the Title VII definition of "employee" in Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). There, as the Third Circuit notes, the Supreme Court "found the term `employees' to be `ambiguous as to whether it excludes former employees'... then construed this ambiguity in favor of Title VII's broad remedial purposes." Erie County, 220 F.3d at 209 (quoting Robinson, 519 U.S. at 341, 345-46, 117 S.Ct. 843) (emphasis added). The Erie County court's reliance on Robinson, a case which expressly found the term "employee" to be ambiguous in an analogous context, seems to indicate that the term "employee" as used in the ADEA is open to more than one possible interpretation.
The Erie County court also recognized ambiguity in the use of the term "older worker" rather than "older employee" in the ADEA's "equal benefit or equal cost" safe harbor. That provision states that it only applies if "the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker...." 29 U.S.C. § 623(f)(2)(B)(i). The Third Circuit noted that "our analysis is complicated by the presence of the term `older worker'.... [I]t is unclear why Congress made this change or what significance it was supposed to have." Erie County, 220 F.3d at 215. While the court ultimately concluded that Congress did not intend the phrase "older worker" to exclude retirees, this additional layer of ambiguity in the statute further demonstrates that the Erie County decision did not determine the only possible interpretation of the ADEA.
Another indication that Erie County did not focus solely on the unambiguous terms of the statute is the court's extended discussion of contradictory legislative history. The Erie County court notes that "while the legislative history may provide assistance in resolving ambiguity, the language of the statute must guide us in the first instance," thereby invoking the canon of statutory interpretation that where a statute's meaning is plain on its face, legislative history cannot be introduced to contradict it. Erie County, 220 F.3d at 209 (citing In re Unisys Sav. Plan Litig., 74 F.3d 420, 444 (3d Cir.1996)); see United States v. Gonzales, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) (where statutory command is straightforward, there is no reason to resort to legislative history); Scafar Contracting, Inc. v. Sec'y of Labor, 325 F.3d 422, 425-26 (3d Cir.2003) (court looks to legislative history only if statutory text is ambiguous). Under this canon, the court could only consider legislative history if there were some ambiguity in the statutory text. Thus, the fact that the Erie County court examined legislative history in some depth indicates that the statutory text does not dictate only one permissible reading.
Not only did the Third Circuit discuss at length the legislative history of the amendments made to the ADEA by the OWBPA, see 220 F.3d at 203-08, the court recognized that even the legislative history itself was ambiguous on the relevant question:
We recognize that there are statements in the legislative history of the OWBPA which indicate that certain members of Congress viewed the ADEA as inapplicable to retirees except when a retiree's benefits are `discriminatorily structured prior to retirement.'
Id. at 210. The court went on to conclude that this legislative history was not reflected in the text of the ADEA. Erie County, 220 F.3d at 210, 214. However, while in this instance, the court rejected an *450 argument from legislative history by pointing to the statute's text, elsewhere the court supports its rejection of an admittedly plausible reading of the statute by reference to legislative history:
In reaching this conclusion [that the "reasonable factors other than age" safe harbor does not apply to Medicare eligibility], we point out that the legislative history we have cited demonstrates that when Congress passed the OWBPA it expressly considered the issue of availability of Medicare coverage.
Id. at 214-15. While the court's interpretation seems to be anchored in the statutory text, it is by no means limited to the text, as can be seen from these appeals to legislative history.[10]
This combination of legislative history and statutory text was more than enough for the Erie County court to conclude that the "best" interpretation of section 4(a)(1) of the ADEA prohibited the employer practice at issue. However, I cannot conclude that the court, on the basis of admittedly ambiguous statutory language, admittedly contradictory legislative history, and an admittedly "difficult task of statutory interpretation," could have reached the only possible interpretation of the statute. Because that is what Brand X demands of Erie County's holding in order for it to foreclose a later, conflicting interpretation of section 4(a)(1) by the EEOC, in light of Brand X, Erie County no longer forecloses a contrary EEOC interpretation. Thus, as I proceed to the next and final step in my analysis, the application of Chevron to the regulation at issue, I write as though on a clean slate.
E. Application of Chevron to the EEOC Regulation
As in AARP I, I must now apply the two-step test of Chevron to the challenged regulation. However, whereas in my earlier opinion I was bound by the Third Circuit's holding in Erie County to find that the regulation failed the first step, now the Supreme Court's decision in Brand X has made it clear that I am not bound by Erie County' s interpretation of the ADEA in reviewing the EEOC's construction.
Chevron directs a court reviewing an agency regulation to first address congressional intent concerning the precise question in issue. Chevron, 467 U.S. at 843, 104 S.Ct. 2778; Marincas, 92 F.3d at 200. In addition to clarifying the relationship between Chevron deference and reliance on prior court precedent, Brand X also impacted the Chevron step one standard itself. In applying Chevron to the regulation at issue in Brand X, the Supreme Court did not ask only whether Congress had "spoken to the precise question at issue," Chevron, 467 U.S. at 843, 104 S.Ct. 2778, but rather "whether the statute's plain terms `directly addres[s] the precise question at issue.'" Brand X, 125 S.Ct. at 2702 (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778) (emphasis added). Thus, Brand X makes it clear that Chevron step one focuses on the plain text of the relevant statute to determine whether Congress has spoken. Brand X *451 also makes it clear that the analysis under Chevron's first step is identical to the analysis of whether a prior judicial precedent controls the later regulation:
The better rule is to hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency's construction on a blank slate.
Brand X, 125 S.Ct. at 2700 (emphasis added). Thus, in both analyses, a court must look to whether the plain text of the statute compels only one permissible interpretation. If the court concludes that there is only one permissible meaning of the statute, then "that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778.
1. Chevron Step One
In order to determine whether Congress has spoken unambiguously to the question, I must first ascertain what the applicable "question" is. In AARP I, my analysis of Chevron step one concluded that "Congress intended for the ADEA to prohibit the practice of coordinating employer-provided retiree health benefits with Medicare eligibility unless the employer could meet the equal cost or equal benefit analysis." AARP I, 2005 WL 723991, at *4. Thus, AARP I implicitly framed the "precise question" as "whether the ADEA prohibits the practice of coordinating retiree benefits with Medicare eligibility." I adopt the same formulation of the relevant question here.
The EEOC argues in its Rule 60(b) motion, as it did in AARP I, that this is not the correct question to ask. This is because the EEOC has represented throughout the litigation that Erie County was correctly decided, and that the ADEA does prohibit Medicare coordination of retiree healthcare benefits. AARP I, 2005 WL 723991, at *5. Nevertheless, the EEOC has argued throughout that it has the power to exempt this practice from the prohibitions of the statute under section 9 of the ADEA, 29 U.S.C. § 628, which provides:
In accordance with the provisions of subchapter II of chapter 5 of Title 5, the Equal Employment Opportunity Commission may issue such rules and regulations as it may consider necessary or appropriate for carrying out this chapter, and may establish such reasonable exemptions to and from any or all provisions of this chapter as it may find necessary and proper in the public interest.
29 U.S.C. § 628. Because it has conceded that the ADEA prohibits coordinating retiree benefits with Medicare eligibility, the EEOC argues that the "precise question" for Chevron step one purposes is "whether Section 9 authorizes the EEOC to issue exemptions, and, if so, whether the EEOC properly determined here that exempting the practice of coordinating retiree health benefits with Medicare eligibility is `necessary and proper in the public interest.'" (Def.'s Mem. Supp. Mot. Rel. J. at 8.) Because this formulation of the "precise question" is required by neither Chevron nor Brand X and would give the EEOC unfettered discretion to issue regulations that contravene the intent of Congress, I decline to adopt it.
(i) The EEOC's formulation of the "precise question"
In AARP I, I gave several reasons for rejecting the EEOC's argument that section 9 of the ADEA authorized the EEOC to allow the employer practice at issue, despite the fact that Erie County had found the practice to violate the ADEA. AARP I, 2005 WL 723991, at *5-6. Because the only change since my earlier opinion is the Supreme Court's decision in *452 Brand X, and Brand X has done nothing to compel the EEOC's view of how Chevron should be applied, I merely expand upon these reasons in rejecting the argument again here.
One key reason that I rejected the EEOC's argument in AARP I was that it would allow the EEOC to pass exemptions that contravene express congressional intent.[11]See AARP I, 2005 WL 723991, at *6. The essence of the EEOC's argument is that section 9 would give it the power to exempt the challenged conduct even if the plain language of the ADEA had clearly and unambiguously indicated a congressional intent to forbid it. Yet as I noted in AARP I, "[a]n administrative agency, including the EEOC, may not issue regulations, rules or exemptions that go against the intent of Congress." AARP I, 2005 WL 723991, at *5. No federal statute or case that I have reviewed authorizes an agency to pass exemptions that contradict unambiguously expressed congressional intent. See Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); see also Mohasco Corp. v. Silver, 447 U.S. 807, 825, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("We must also reject any suggestion that the EEOC may adopt regulations that are inconsistent with the statutory mandate. As we have held on prior occasions, its `interpretation' of the statute cannot supersede the language chosen by Congress.").
Thus, the EEOC presents the novel[12] and paradoxical question of whether Congress "intended" section 9 to authorize the EEOC to pass exemptions that *453 override unambiguously expressed congressional intent. Such a sweeping interpretation of the EEOC's power would seem to be, in effect, a congressional delegation to the EEOC of the power to partially repeal portions of the ADEA  a delegation that might very well violate the separation of powers doctrine. Article I, section 1 of the Constitution vests "[a]ll legislative Powers herein granted... in a Congress of the United States" and "permits no delegation of those powers." Whitman v. American Trucking Ass'n, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). Moreover, "repeal of statutes, no less than enactment, must comport with Article I." Clinton v. City of New York, 524 U.S. 417, 438, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (quoting INS v. Chadha, 462 U.S. 919, 954, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). Although the Supreme Court has not invalidated a Congressional grant of authority to an agency under the "nondelegation" doctrine since A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the interpretation of section 9 advocated by the EEOC veers close to the constitutional limit.[13]
It is true that Congress need only give an agency an "intelligible principle" upon which to regulate in order to satisfy the nondelegation doctrine. Whitman, 531 U.S. at 472, 121 S.Ct. 903. It is also true that many statutes authorizing regulation "in the public interest" have been upheld as laying down a sufficiently "intelligible principle." See, e.g., Nat'l Broad, Co., Inc. v. United States, 319 U.S. 190, 225-26, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (upholding delegation to FCC of authority to regulate airwaves "as public convenience, interest, or necessity requires"). However, neither the parties nor this Court has found any case that sanctions congressional delegation to an agency of the authority to undo what Congress has done through clear and unambiguous statutory language.[14] While the nondelegation cases establish that Congress may leave wide statutory gaps to be filled by agencies, an agency has no authority to regulate where a statutory provision "unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill...." Brand X, 125 S.Ct. at 2700.
However, this case does not present the difficult question of whether the EEOC can promulgate an exemption under section 9 of the ADEA that contradicts the unambiguously expressed intent of Congress. This is because, as set forth fully below, Congress did not express a clear and unambiguous intent to prohibit Medicare coordination of retiree health benefits in the ADEA. Indeed, under Brand X, there is a gap in the ADEA with respect to *454 whether it applies to retiree benefits at all, because Erie County' s conclusion that it does is not the "only permissible" construction of the statute. As I noted in my earlier opinion, "[t]he EEOC has the power to issue rules, regulations and exemptions within these explicit, or implicit, gaps that Congress left in the ADEA."[15]AARP I, 2005 WL 723991, at *6. Thus, because there is a gap in the statute, the EEOC could promulgate a rule that interpreted the ADEA not to apply to any retiree benefits, although it has clearly stated that it has no intention to do so. Since retiree healthcare benefits are merely a subset of a class of benefits that the EEOC could theoretically exclude from the protections of the ADEA, the EEOC's exemption of Medicare coordination of healthcare benefits is both a "permissible construction of the statute" and a "reasonable policy choice for the agency to make." Chevron, 467 U.S. at 843, 845, 104 S.Ct. 2778.
This interpretation of the EEOC's authority to exempt under section 9 of the ADEA has at least two strengths. First, it avoids the potential constitutional problems with the EEOC's interpretation, consistent with the doctrine of constitutional avoidance. See Clark v. Martinez, 543 U.S. 371, 125 S.Ct. 716, 724, 160 L.Ed.2d 734 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail...."); United States v. Navarro, 145 F.3d 580, 589 (3d Cir.1998) (courts generally avoid statutory constructions that raise doubtful constitutional questions). Indeed, the Supreme Court has often avoided nondelegation questions by interpreting statutes narrowly. See, e.g., Nat'l Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 340-41, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) (construing FCC assessment as a "fee" rather than a "tax" to avoid question of whether Congress unconstitutionally delegated taxing power to agency); Kent v. Dulles, 357 U.S. 116, 129-30, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (construing delegation to Secretary of State of power to issue passports to exclude power to deny on basis of political beliefs). Restricting the EEOC's section 9 exemption power to circumstances in which Congress has left a gap in the ADEA provides a limiting principle that avoids a nondelegation problem. An additional strength of this reading of section 9 is that it addresses the EEOC's argument that an adequate interpretation of the provision must not render the exemption clause superfluous. See AARP I, 2005 WL 723991, at *5. Under the interpretation adopted here, the EEOC is free to issue exemptions in the "gaps" where Congress has not unambiguously foreclosed agency interpretation  so long as those exemptions are "necessary and proper in the public interest," 29 U.S.C. § 628, and satisfy the second step of Chevron.
(ii) The AARP's argument that the EEOC has conceded Chevron step one
As a last step before evaluating the regulation at issue under the Chevron test, I will address the AARP's argument that the EEOC has conceded that its exemption fails Chevron step one. The AARP argues that since the relevant question for Chevron's first step is "whether the ADEA prohibits the challenged employer practice," and the EEOC does not interpret *455 the ADEA to allow the practice, this Court's Chevron inquiry is at an end. (Pls.' Opp. Def.'s Mot. Rel. J. at 3 n. 2.) However, Brand X established that the relevant question under Chevron step one is whether the statute's plain terms compel only one permissible interpretation. Crucially, the EEOC has never conceded that Erie County held that the only permissible interpretation of section 4(a)(1) forbids the conduct at issue. It is true that in AARP I, I stated that "[t]he EEOC does not dispute the holding of Erie County, that the plain language of the ADEA prohibits the practice of coordinating retiree benefits with Medicare eligibility." AARP I, 2005 WL 723991, at *5. However, this characterization of the EEOC's position was made before Brand X changed the definition of a "plain-language" holding in the context of the Chevron framework. As discussed at length above, Erie County did not hold that the ADEA's "plain language" forbid the practice at issue because, under Brand X, it did not state only one permissible interpretation of the statute, rather than merely the best interpretation.
Subsequent to the Brand X decision, far from conceding that Erie County's holding followed from the unambiguous terms of the ADEA, the EEOC has argued that Erie County "was not a plain language decision on the central issue of whether an employer violated the ADEA by [coordinating health benefits with Medicare eligibility]." (Def.'s Mem. Supp. Mot. Rel. J. at 8). Nowhere has the EEOC admitted that there is only one permissible reading of section 4(a)(1) that unambiguously forbids the conduct at issue. Under Brand X and Chevron, if there is more than one permissible reading of the statute, then there is a statutory gap that an agency is entitled to fill with any "permissible construction." Chevron, 467 U.S. at 843. Because there is more than one permissible interpretation of section 4(a)(1), it leaves such a gap, and the EEOC is entitled to fill it with any reasonable regulation.
(iii) The regulation passes Chevron step one
Having determined the relevant "precise question" for Chevron step one, I must now apply the first step of Chevron to the EEOC's proposed regulation. In determining whether Erie County foreclosed a contrary interpretation of section 4(a)(1) of the ADEA by the EEOC, Brand X required me to ask whether Erie County's interpretation of the statute "follow[ed] from the unambiguous terms of the statute" such that it was the only permissible reading of section 4(a)(1). Brand X, 125 S.Ct. at 2700-01. Since, as discussed above, Brand X establishes that exactly the same standard should apply in Chevron step one, see id. at 2701, I must now make an independent determination of whether a construction of section 4(a)(1) that contradicts the EEOC's interpretation is the only permissible reading of the statute.
However, having already concluded that Erie County did not hold that the plain text of section 4(a)(1) compels only one permissible interpretation, I do not now go where the Third Circuit did not venture. Given the inherent ambiguities in the statutory language, the conflicting legislative history, and the various opposing policy arguments underlying section 4(a)(1), the plain language of the provision cannot be said to unambiguously foreclose the EEOC's exemption. Thus, because Congress has not "spoken to the precise question at issue" in the plain terms of the ADEA, the EEOC's proposed exemption satisfies Chevron step one. Chevron, 467 U.S. at 843, 104 S.Ct. 2778; Brand X, 125 S.Ct. at 2702.
*456 2. Chevron Step Two
I come now to step two of the Chevron test, which asks whether the regulation is "based on a permissible construction of the statute" such that it is a "reasonable policy choice for the agency to make." Chevron, 467 U.S. at 843, 845, 104 S.Ct. 2778. This test has been described as one of "reasonableness," Chen v. Ashcroft, 381 F.3d 221, 224 (3d Cir.2004) (citing Chevron, 467 U.S. at 845, 865, 866, 104 S.Ct. 2778), under which "the agency's regulation is `given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" Household Credit Serv., Inc. v. Pfennig, 541 U.S. 232, 239, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004) (quoting Chevron, 467 U.S. at 844, 104 S.Ct. 2778).
The earlier part of this opinion detailed how neither the Erie County decision nor the plain text of section 4(a)(1) clearly and unambiguously establishes that the ADEA applies to retiree benefits at all or that it prohibits Medicare coordination of retiree health benefits. Though the Third Circuit's interpretation in Erie County may indeed be the best reading of the statute, it is not the only permissible reading within the meaning of Brand X. Thus, even if the EEOC had proposed a regulation that interpreted the ADEA's protections not to apply to retiree benefits at all, I would be compelled to find it "a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778. However, the EEOC has chosen instead to maintain that the ADEA does apply to retiree benefits generally, while specifically exempting the practice of Medicare coordination of health benefits. See 68 Fed.Reg. at 41547 ("No other aspects of ADEA coverage or benefits other than retiree health benefits are affected by this exemption."). Thus, the question becomes whether this is a reasonable way for the EEOC to fill the gap that Congress has left in the ADEA. I conclude that it is.
Erie County's reading of section 4(a)(1) of the ADEA  that it applies to retiree benefits generally and prohibits Medicare coordination of retiree healthcare benefits  is not the "only permissible" construction of the ADEA. Thus, the EEOC has the flexibility to decide whether retiree benefits are covered by the Act at all. Section 9 of the ADEA, which allows the EEOC to "establish such reasonable exemptions to and from any or all provisions of this chapter as it may find necessary and proper in the public interest," 29 U.S.C. § 628, gives the EEOC power to "deregulate," or forbear from exercising its regulatory authority, when the public interest requires. Compare 47 U.S.C. § 160(a) (providing that the FCC "shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service" where enforcement is not necessary and forbearance is in the public interest). Taken together, section 4(a)(1) and section 9 allow the EEOC to interpret the ADEA to cover retiree benefits generally while exempting the practice of Medicare coordination of health benefits. In limiting its exemption to healthcare benefits, the EEOC is merely interpreting section 4(a)(1) of the ADEA to apply to retiree benefits (which is within its authority to do), while at the same time forbearing from exercising its regulatory authority with respect to a subset of retiree benefits (which section 9 allows it to do).[16]
Two well-recognized canons of statutory interpretation guide this reading of the *457 interaction between section 4(a)(1) and section 9 of the ADEA: the canon that statutes are to be interpreted so as not to render any provision superfluous and the canon of constitutional avoidance. The interpretation set forth here gives content to the exemption clause of section 9, by reading it to allow the EEOC to exempt any employer conduct within its sphere of regulatory authority, i.e., where there is a gap in the statute. At the same time, this reading forbids the EEOC from stepping outside this permissible regulatory sphere in its exercise of section 9 exemption power, and thus avoids a thorny nondelegation issue. Another consideration that guides this interpretation is the Supreme Court's recent admonition in Brand X that "Chevron's premise is that it is for agencies, not courts, to fill statutory gaps." Brand X, 125 S.Ct. at 2700. Chevron commands a reviewing court to inquire whether there is a gap in the statute; if so, then the agency is entitled to regulate in any reasonable manner within that gap. See Chen, 381 F.3d at 224 (characterizing Chevron step two as test of regulation's "reasonableness"). Here, there is a gap in section 4(a)(1), which the EEOC has chosen to fill by interpreting the section to apply to retiree benefits generally, while carving out an exception for health benefits under its section 9 authority. Because this combination of sections 4 and 9 is a reasonable way for the EEOC to fill the statutory gap, it passes the second step of the Chevron test.[17]
F. Whether the Regulation is "Arbitrary and Capricious"
Having concluded that the EEOC's regulation passes the two-part test of Chevron, I am bound to uphold it unless it is otherwise "arbitrary and capricious" under section 706(2) of the APA. See Pfennig, 541 U.S. at 239, 124 S.Ct. 1741; Chen, 381 F.3d at 224; see also Brand X, 125 S.Ct. at 2710-12 (rejecting argument that regulation was arbitrary and capricious after finding that it satisfied two-step Chevron test). The traditional "arbitrary and capricious" standard under the APA asks "whether [the agency] considered the relevant factors and articulated a rational connection between the facts found and the choice made." Southwestern Pa. Growth Alliance v. Browner, 121 F.3d 106, 111 (3d Cir.1997). The scope of review is "narrow, and a court is not to substitute its judgment for that of the agency." Prometheus Radio Project v. FCC, 373 F.3d 372, 389 (3d Cir.2004) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The AARP has put forth several arguments as to why the regulation cannot meet this admittedly "highly deferential standard," Conoco, Inc. v. Skinner, 970 F.2d 1206, 1216 (3d Cir.1992), all of which I find insufficient as a matter of law.
The AARP first claims that the EEOC failed to "conside[r] the relevant factors" in promulgating the exemption at issue, Growth Alliance, 121 F.3d at 111, but this allegation is without support in the record. It is clear that the EEOC consulted numerous sources and assembled a copious amount of data before promulgating the regulation at issue. Before publishing its Notice of Proposed Rulemaking ("NPRM") *458 in the Federal Register, the EEOC gathered information on retiree health benefits from unions, private employers, employee groups, actuaries, benefits consultants, human resources consultants, and state and local government representatives. 68 Fed.Reg. at 41542. The EEOC also examined a study by the General Accounting Office ("GAO"), reviewed survey data and scholarly publications on retiree health benefits,[18] and held meetings with various stakeholders.[19]Id.
The data indicated to the EEOC that a declining number of employers were providing health benefits to retirees, id. at 41544, and that "concern about the potential application of the ADEA to employer-sponsored retiree benefits [was] adversely affecting the continued provision of this important benefit." Id. at 41542. The GAO report, which was submitted to the Senate Committee on Health, Education, Labor and Pensions in May 2001, expressed concern that the EEOC's enforcement of Erie County "could potentially accelerate the decline of retiree health benefits." U.S. General Accounting Office, Retiree Health Benefits: Employer-Sponsored Benefits May Be Vulnerable to Further Erosion (GAO Doc. No. GAO-01-374), at 16 (2001) (ADR07746). The report indicated that employers might seek to comply with the ADEA by eliminating or "reducing benefits to the lowest common level for all retirees." Id. at 17 (ADR07747). Another study agreed that in response to EEOC enforcement of Erie County, employers might "eliminate many retiree medical programs altogether." Anna M. Rappaport, "FAS 106 and Strategies for Managing Retiree Health Benefits," in Compensation and Benefits Management, Spring 2001, at 38 (ADR08141); see also Paul Frontsin, "Retiree Health Benefits: Trends and Outlook," in EBRI Issue Brief No. 236, Aug. 2001, at 14 (ADR07979).
On the basis of its research, the EEOC concluded that the public interest would best be served by a narrow exemption from the ADEA for Medicare coordination of retiree health benefits. See Age Discrimination in Employment Act Regulation for Retiree Health Benefits, Final Rule approved by Commission, Apr. 22, 2004, at 2 ("Final Rule") (ADR09723). The EEOC examined various alternatives to the exemption it ultimately proposed and found them unworkable. See 68 Fed.Reg. at 41546. After publishing its proposed exemption for notice and comment, the EEOC received numerous comments in favor of the exemption from employers who either already had or would soon need to reduce retiree health benefits in order to comply with the ADEA. (Comments of Minnesota Sch. Bd. Ass'n, at 2, ADR07219; Comments of Nat'l Rural Elec. Coop. Ass'n, at 2, ADR07233; Comments of Wisconsin Ass'n of Sch. Bds., at 2, ADR07257; Comments of Burke, William & Sorenson LLP, at 2, ADR07174.) At the end of the notice-and-comment period, after considering all the data available, the EEOC voted to approve the regulation at issue. (Notation Voting Record, ADR09307.) The EEOC's in-depth study of retiree health benefits, as well as its consideration of *459 various viewpoints in the stakeholder meetings, demonstrate that the EEOC "considered the relevant factors" before promulgating the regulation at issue. Growth Alliance, 121 F.3d at 111.
Furthermore, the EEOC "articulated a rational connection between the facts found and the choice made." Id. The information and comments received by the EEOC indicated that "concern about the potential application of the [ADEA] ... to employer-sponsored retiree health benefits ... has adversely affected the availability of this benefit." Final Rule, at 2 (ADR09723). The asserted purpose of the regulation at issue is to "ensure that the application of the ADEA does not discourage employers from providing health benefits to their retirees." 68 Fed.Reg. at 41542. Thus, there is a rational connection between the information on which the EEOC relied and the regulation it ultimately passed. Under the arbitrary and capricious standard, "if a reasonable person could rely on the agency's studies to reach its conclusions, the conclusions are not arbitrary," Rite Aid of Pa., Inc. v. Houstoun, 171 F.3d 842, 854 (3d Cir.1999), and the EEOC has more than met this standard.
The AARP also claims that the regulation is arbitrary and capricious because the EEOC has no special competence to make healthcare policy. (Pls.' Mem. Supp. Mot. Prelim. Inj. at 10, 25-27.) However, because the question that the EEOC's regulation addresses  i.e., which employee benefits are covered by the ADEA  is surely within the agency's purview, it is irrelevant that the regulation may have consequences for the provision of healthcare generally. Indeed, it is a rare agency regulation that does not have some consequences in fields outside of the issuing agency's statutory mandate.
Next, the AARP claims that the EEOC made an arbitrary and capricious policy shift from its position in the Erie County amicus brief to the position reflected in the regulation at issue. (Pls.' Reply Supp. Mot. Prelim. Inj. at 11-12.) However, an agency is "free within the limits of reasoned interpretation to change course if it adequately justifies the change." Brand X, 125 S.Ct. at 2710. The mere fact that an agency has changed its policy does not render a regulation arbitrary and capricious "so long as [the agency] can justify its change with a `reasoned analysis.'" Horn v. Thoratec Corp., 376 F.3d 163, 179 (3d Cir.2004) (citing State Farm, 463 U.S. at 42, 103 S.Ct. 2856). Here, the EEOC has acknowledged the position it took in Erie County, see 68 Fed.Reg. at 41545 n.25, and has given a reasoned explanation for its change. See id. at 41546 ("The Commission is concerned that many employers will respond to [Erie County] ... not by incurring additional costs for retiree benefits that supplement Medicare, but rather by reducing or eliminating health coverage for retirees who are not yet eligible for Medicare."). Thus, the EEOC's reasoned change in policy was neither arbitrary nor capricious.
Finally, the AARP claims that in promulgating the exemption at issue, the EEOC failed to follow its own regulations, which require a "strong affirmative showing" that an exemption is "necessary and proper in the public interest" as well as "due regard for the remedial purpose of the [ADEA]" before the agency can exercise its section 9 exemption power. (Pls.' Mem. Supp. Mot. Prelim. Inj. at 23-25, citing 29 C.F.R. § 1627.15(b).) While an agency is bound to follow its own self-imposed regulatory limitations, see United States v. Nixon, 418 U.S. 683, 695-96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), this *460 particular limitation seems only to require that the agency come to a reasoned decision after considering all the factors. In the absence of any case law interpreting 29 C.F.R. § 1627.15(b), I am left to conclude that it imposes only a slightly higher burden than the arbitrary and capricious standard of 706(2) of the APA. The EEOC has easily passed that low hurdle, and it has also demonstrated "due regard" for the purposes of the ADEA and made the "strong affirmative showing" that the exemption is necessary and proper in the public interest.
In AARP I, I found that there were no genuine issues of material fact and that the AARP was entitled to judgment as a matter of law on the question of whether the regulation was "not in accordance with law" under section 706(2) of the APA. AARP I, 2005 WL 723991, at *6. Thus, I granted the AARP's motion for summary judgment. Id. Summary judgment under Federal Rule of Civil Procedure 56(c) should be granted "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." Kornegay v. Cottingham, 120 F.3d 392, 395 (3d Cir.1997). Because I now find that Defendant EEOC is entitled to judgment as a matter of law, both on the question of whether the regulation is contrary to law and on whether it is arbitrary and capricious, I will vacate my Order granting summary judgment to Plaintiffs and enter summary judgment in favor of Defendant on Count I of Plaintiffs' complaint.
In AARP I, I did not allow the EEOC to do with an "exemption" under section 9 of the ADEA what the Third Circuit's Erie County decision foreclosed it from doing by way of regulation. Now, Brand X has made it clear that neither Erie County nor the plain text of section 4(a)(1) of the ADEA dictate a single permissible interpretation that would foreclose the EEOC from interpreting the ADEA not to apply to any retiree benefits. Thus, under Chevron, the EEOC could theoretically construe section 4(a)(1) to either include or exclude all retiree benefits. Additionally, under section 9 of the ADEA, the EEOC can forbear from exercising its regulating authority when "necessary and proper in the public interest." Thus, the EEOC is free, under section 4(a)(1), to conclude that the ADEA covers retiree benefits generally, and equally free, under section 9, to exempt the practice of Medicare coordination of retiree health benefits. Because the EEOC's regulation was not otherwise "arbitrary or capricious," it passes the Chevron test and is a lawful exercise of the agency's rulemaking authority.
F. Count II of the AARP's Complaint
Finally, I reach Count II of the AARP's complaint, which I did not need to reach in AARP I. Count II alleges that the regulation at issue was promulgated "based upon comments, input and information that were not available to plaintiffs and others during the notice and comment rulemaking," in violation of 5 U.S.C. § 553. (Pls.' Compl. at 22.) Because there are no genuine issues of material fact with respect to Count II of Plaintiffs' complaint, and Defendant is entitled to judgment as a matter of law, I will deny Plaintiffs' motion for summary judgment on Count II and grant summary judgment in favor of Defendant.
The AARP claims that "ex parte communications that directly influenced EEOC action were not disclosed to the plaintiffs during the notice and comment period." (Pls.' Reply Supp. Prelim. Inj. at 15.) Particularly, *461 the AARP claims that the EEOC failed to adequately respond to the AARP's Freedom of Information Act ("FOIA") request for documents relating to EEOC meetings with stakeholders prior to the issuance of the Notice of Proposed Rulemaking.[20] (Id. at 15-16.) However, even viewing the facts in the light most favorable to the Plaintiffs, I find these allegations insufficient as a matter of law. First of all, as the EEOC points out, 5 U.S.C. § 553, which governs the type of informal rulemaking undertaken in this case, does not forbid ex parte communications with an agency. Cf. 5 U.S.C. § 557(d)(1) (prohibiting ex parte communications with agency in the context of formal rulemaking). Indeed, courts have recognized that in the informal rulemaking context, "informal contacts between agencies are the `bread and butter' of the process of administration and are completely appropriate so long as they do not frustrate judicial review or raise serious questions of fairness." Home Box Office, Inc. v. FCC, 567 F.2d 9, 57 (D.C.Cir.1977).
Thus, the only question before me is whether the EEOC withheld the information it relied upon in such a way as to "frustrate judicial review or raise serious questions of fairness," and it is clear that the EEOC did neither. To the contrary, the EEOC took the information it had gathered, both from private parties and from publicly available sources, and presented it in the NPRM in such a way as to "fairly apprise interested parties of all significant subjects and issues involved." Fertilizer Inst. v. Browner, 163 F.3d 774, 779 (3d Cir.1998) (quoting Am. Iron & Steel Inst. v. EPA, 568 F.2d 284, 291 (3d Cir.1977)). It is true that courts have sometimes invalidated regulations where an agency completely withheld "critical factual underpinnings for rule making." Mortgage Investors Corp. of Ohio v. Gober, 220 F.3d 1375, 1379 (Fed.Cir.2000); see also Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 393 (D.C.Cir.1973) (agency may not "promulgate rules based inadequate data or data that, [to a] critical degree, is known only to the agency") (emphasis added). But no case has held that an agency must disclose each and every piece of information that goes into its decision or suffer the invalidation of its rule. See, e.g., Mortgage Investors, 220 F.3d at 1380 (upholding regulation despite agency's failure to disclose relevant statistical data).
Ultimately, all of the AARP's claims that the EEOC failed to disclose information are beside the point, as the AARP has failed to show that any prejudice resulted. Notice-and-comment errors do not automatically invalidate a regulation; the party asserting the error must also demonstrate prejudice to its ability to effectively comment on the proposed rule. See 5 U.S.C. § 706 (providing that in review of administrative action under the APA, "due account shall be taken of the rule of prejudicial error"); See First Am. Discount Corp. v. Commodity Futures Trading Comm'n, 222 F.3d 1008, 1015 (D.C.Cir.2000) ("As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error."). Thus, in order to prevail, the AARP must "indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity." Pers. Watercraft Indus. Ass'n v. Dep't of *462 Commerce, 48 F.3d 540, 544 (1995) (internal citations omitted). Through discovery in this litigation, the AARP received substantially all of the information it originally sought in its FOIA request and has had ample time to review it. (Third Decl. of Christopher G. Mackaronis ¶¶ 8-11.) However, the AARP has failed to point to any particular withheld information that was critical to the EEOC's rule and which the AARP was deprived of the opportunity to refute. Thus, even when the facts are viewed in the light most favorable to the Plaintiffs, any alleged notice-and-comment violation by Defendant constituted harmless error. For this reason and the others above, I will grant summary judgment to Defendant on Count II of the Plaintiffs' complaint.
V. CONCLUSION
In light of the Supreme Court's decision in Brand X, the EEOC's proposed regulation, 68 Fed.Reg. 41542, is not contrary to law under the APA, 5 U.S.C. § 706(2). Thus, Defendant has raised "a supervening change in governing law that calls into question the correctness" of my prior grant of summary judgment and a permanent injunction to Plaintiffs, Enigwe, 320 F.Supp.2d at 308, and which has made it "no longer equitable that the judgment should have prospective application," Fed.R.Civ.P. 60(b)(5). Accordingly, I now vacate my Order of March 30, 2005, which granted summary judgment to Plaintiffs on Count I of their complaint and permanently enjoined Defendant from publishing or otherwise implementing the proposed rule. Because there are no genuine issues of material fact with respect to either Count I or Count II of Plaintiffs' complaint, and Defendant is entitled to judgment as a matter of law, I now grant summary judgment to Defendant on both counts.
Vacating my Order of March 30, 2005 will dissolve the permanent injunction forbidding Defendant from publishing or otherwise implementing the proposed regulation. However, because the parties have already indicated their intention to appeal by appealing my earlier decision, it is appropriate to keep the injunction in effect pending that appeal. Federal Rule of Civil Procedure 62(c) provides that "[w]hen an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal...." Fed.R.Civ.P. 62(c). To obtain a stay pending appeal, a party must generally establish four factors similar to those necessary for a preliminary injunction: (1) that the party is likely to succeed on the merits of the appeal, (2) that unless a stay is granted, it will suffer irreparable injury, (3) that no substantial harm will come to other interested parties, and (4) that a stay will do no harm to the public interest. See Howes v. Medical Components, Inc., 741 F.Supp. 528, 530 (E.D.Pa.1990). The Plaintiffs originally moved for a preliminary injunction in AARP I, but Defendant's stipulation that it would not publish the regulation until after my decision made such an injunction unnecessary. (Order of 2/7/05.) I now credit Plaintiffs' assertions in their request for a preliminary injunction that they will suffer irreparable harm from the publication of the regulation, and that neither the EEOC nor the public will suffer irreparable harm from a slight further delay in publication while the legality of the exemption is finally resolved. (See Pls.' Mot. Supp. Prelim. Inj. at 32-43.) As for the likelihood of success on appeal, courts have held that where "the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively *463 slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay." Providence Journal Co. v. FBI, 595 F.2d 889, 889 (1st Cir.1979). Thus, I will stay the portion of my Order vacating the injunction so as to maintain the status quo pending appeal.

ORDER
AND NOW, this 27th day of September, 2005, it is ORDERED that:
(1) Defendant's Motion for Relief from Judgment (Doc. # 70) is GRANTED; and
(2) This Court's Amended Memorandum and Order of March 30, 2005 (Doc. # 60) is VACATED; however, with respect to this Court's permanent injunction enjoining Defendant from publishing or otherwise implementing the proposed regulation, this Order to Vacate is STAYED pending the resolution of any appeal of this case; and
(3) Plaintiffs' motion for summary judgment (Doc. # 54) is DENIED and Defendant's motion for summary judgment (Doc. # 53) is GRANTED.
NOTES
[1] The EEOC is the agency charged with implementing the ADEA. See 29 U.S.C. § 628.
[2] As in my earlier opinion, I note that the parties have used the words "rule," "regulation," and "exemption" interchangeably to refer to the regulation at issue, and I do the same. See AARP I, 2005 WL 723991, at *1 n. 1.
[3] This exemption had the support of various amici curiae, representing both industry and labor. (See Br. Amici Curiae of the Equal Employment Advisory Council, HR Policy Association, America's Health Insurance Plans, American Benefits Council, the Chamber of Commerce of the United States, the ERISA Industry Committee, National Rural Electric Cooperative Association, and the Society for Human Resource Management; see also Br. Amici Curiae of the National Education Association, the American Federation of Teachers, and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America.)
[4] The EEOC moved for relief from judgment under "Rule 60(b)." (Def.'s Mot. Rel. J. at 1.) While the EEOC only addressed Rule 60(b)(6) in its accompanying memorandum of law, (Def.'s Mem. Supp. Mot. Rel. J. at 5), because my earlier ruling had "prospective application" within the meaning of 60(b)(5), I consider that subsection as well. See In re Four Seasons Sec. Laws Litig., 502 F.2d 834, 841 (10th Cir.1974) (noting that where motion is timely filed under any of the 60(b) clauses, court is not bound by strict categorization of particular claims). In any event, because Brand X is a "supervening change in governing law that calls into question the correctness" of my earlier judgment, Enigwe, 320 F.Supp.2d at 308, the EEOC has also presented "extraordinary circumstances" justifying relief under 60(b)(6). Id.
[5] Section 4(a)(1) forbids, inter alia, "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).
[6] Section 623(f)(2)(B)(i) provides: "It shall not be unlawful for an employer, employment agency, or labor organization... to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section ... to observe the terms of a bona fide employee benefit plan ... where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations (as in effect on June 22, 1989)."
[7] The EEOC filed an amicus brief in Erie County advocating the position the Third Circuit eventually adopted, i.e., that employers should be required to meet the "equal cost or equal benefit" test when reducing retiree health care benefits in response to Medicare eligibility. (Def.'s Mem. Supp. Mot. Rel. J. at 3; Pls.' Opp. Def.'s Mot. Rel. J. at 3 n. 2.) However, the EEOC subsequently sought notice and comment on the effects of the Erie County decision, through which it learned that many employers were deciding not to cover retirees at all in light of Erie County, which was within their rights under the ADEA. See AARP I, 2005 WL 723991, at *2. It was in response to these "unintended consequences" of its policy that the EEOC promulgated the exemption at issue here. (Def.'s Reply Supp. Mot. Rel. J. at 3.) If the EEOC has changed its position since Erie County, it should not detain us long, since "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency ... must consider varying interpretations and the wisdom of its policy on a continuing basis." Chevron, 467 U.S. at 863-64, 104 S.Ct. 2778.
[8] Section 554(e) of the APA provides that an agency, "in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e).
[9] In so holding, the Supreme Court limited its prior decision in Neal v. United States, a case on which I expressly relied in my AARP I opinion. The Court stated that the Ninth Circuit's reliance on Neal was misplaced, and that Neal does not stand for the proposition that a "prior judicial construction of a statute categorically controls an agency's contrary construction." Brand X, 125 S.Ct. at 2701. The Court distinguished Neal by characterizing Chapman v. United States, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the case on which it had relied in Neal, as holding that the relevant statute was in fact unambiguous. Id.
[10] The Erie County court also made several references to the policies underlying the ADEA. See 220 F.3d at 216 (noting that "it makes good sense and furthers Congress' intent to apply the equal benefit or equal cost principle in this case"); id. (noting that its interpretation "strikes a fair middle ground between the interest of the employer and the interests of older retirees"). Like its arguments from legislative history, the court's appeals to general congressional intent and the balancing of competing policy considerations would seem unnecessary if its decision were the only permissible construction of the statute.
[11] In AARP I, I also noted that "examining solely the statutory provision that delegates rulemaking authority rather than the ADEA as a whole, the approach the EEOC is advocating, would render meaningless the first step of Chevron." AARP I, 2005 WL 723991, at *5. The Supreme Court has never decided whether an agency's interpretation of the scope of its own statutory authority is entitled to Chevron deference. Compare Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 387, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Brennan, J., dissenting) ("[T]his Court has never deferred to an agency's interpretation of a statute designed to confine the scope of its jurisdiction.") with id. at 381, 108 S.Ct. 2428 (Scalia, J., concurring in the judgment) ("[I]t is settled law that the rule of deference applies even to an agency's interpretation of its own statutory authority or jurisdiction."); see also Bus. Roundtable v. SEC, 905 F.2d 406, 408 (D.C.Cir.1990) ("The Supreme Court cannot be said to have resolved the issue definitively."). Likewise, the most recent Third Circuit case to face this question expressly declined to reach it. See Lancashire Coal Co. v. Sec'y of Labor, Mine Safety & Health Admin., 968 F.2d 388, 393 n. 4 (3d Cir.1992) ("We thus avoid the need to reach the question as to when an agency is entitled to deference on issues regarding its own jurisdiction.").

I recognize that statements in two earlier Third Circuit cases, neither of which was cited to me by the parties, seem to indicate that agency interpretations of their own statutory authority may in fact be entitled to deference in some circumstances. See Air Courier Conference of Am./Int'l Comm. v. U.S. Postal Serv., 959 F.2d 1213, 1223 (3d Cir.1992); Puerto Rico Maritime Shipping Auth. v. Valley Freight Systems, Inc., 856 F.2d 546, 552 (3d Cir.1988). However, no case that I have reviewed commands deference to an agency interpretation that contravenes unambiguous congressional intent. See Air Courier Conference, 959 F.2d at 1224 ("Of course, we recognize that judicial deference to an agency's construction of a statute in conflict with the statute's plain meaning would be inappropriate.").
[12] Prior to this case, the EEOC has passed only one "exemption" under section 9  allowing non-EEOC-supervised waivers of claims under the ADEA  and because that exemption did not lead to any litigation, the question of the EEOC's authority to issue exemptions under section 9 has never been squarely presented to a court. (Tr. 3/18/05 at 12-13.)
[13] Absent a clear statement from Congress, courts are reluctant to follow agency interpretations of statutes that would push the constitutional limits of congressional authority. "Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159, 172-73, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).
[14] Nor could the EEOC avoid this nondelegation problem through its self-imposed requirement that exemptions under section 9 be exercised "with caution and due regard for the remedial purpose of the statute" and only upon a "a strong and affirmative showing" that the exemption is necessary and proper in the public interest. 29 C.F.R. § 1627.15. As the Supreme Court has said, "[t]he very idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory." Whitman, 531 U.S. at 473, 121 S.Ct. 903.
[15] Plaintiffs themselves admit that "[i]f there is a `gap' in the statute, the agency can regulate so long as the regulation is not arbitrary, capricious, or otherwise contrary to law." (Pls.' Reply Supp. Mot. Prelim. Inj. at 4.)
[16] The EEOC's regulation can also be understood as filling several distinct gaps in the ADEA in different ways. Erie County addressed at least two potential ambiguities in the statute: (1) whether the ADEA applies to retiree benefits at all, see 220 F.3d at 208-09, and (2) whether Congress nonetheless intended to allow employers to coordinate retiree health benefits with Medicare without meeting the "equal benefit or equal cost" safe harbor, see id. at 213-14. The EEOC's exemption has the effect of answering "yes" to both questions.
[17] I also find that the regulation at issue falls within the EEOC's discretion to make exemptions to the ADEA as "necessary and proper in the public interest" within the meaning of 29 U.S.C. § 628.
[18] The administrative record includes several hundred pages of studies and articles that were consulted by the EEOC and cited in its NPRM, (ADR08120-ADR08125, ADR08174-ADR08362, ADR08372-ADR08527, ADR08561-ADR08565, and ADR09746-09749), and still more that were reviewed but not cited (ADR0863-ADR08371, ADR08538-ADR08561, ADR08566-ADR09031, ADR09034-ADR09042, and ADR09741-ADR09745).
[19] These stakeholders consisted of, inter alia, labor unions, industry groups, and advocacy groups, and included the AARP. (See ADR08022 (list of stakeholder meetings); ADR08008-ADR08013 (sign-in sheets).)
[20] As noted above, at least one of these stakeholder meetings was in fact attended by representatives of the AARP, and it appears to have been dedicated to discussion of the AARP's concerns. (See ADR08022 (list of stakeholder meetings), ADR08039-ADR08046 (notes from "AARP" meeting).)